**Fouad Yacoub RAFEEDIE, Plaintiff,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, et al., Defendants.**

Civ. A. No. 88–0366.

United States District Court,
District of Columbia.

June 15, 1988.

David Cole, Center for Constitutional Rights, New York City, Timothy P. Dyk, Kerry W. Kircher, John K. Lapiana, Wilmer, Cutler & Pickering, Michael Maggio, Nat. Lawyers Guild, Visa Denial Project, Washington, D.C., James R. Fennerty, Nat. Lawyers Guild, Chicago, Ill., Marc Van Der Hout, San Francisco, Cal., for plaintiff.

Allen W. Hausman, Asst. Director, Linda S. Wendtland, Office of Immigration Litigation, Civ. Div., Dept. of Justice, William P. Joyce, Associate General Counsel, I.N.S., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Fouad Yacoub Rafeedie, a permanent resident alien who has resided in the United States for the past thirteen years, except for a two-week trip to Syria in April 1986 to attend a meeting of the Palestinian Youth Organization ("PYO"),

challenges the decision of the Immigration and Naturalization Service ("INS")[1] that seeks to exclude him from reentering the country through a summary exclusion proceeding conducted under Section 235(c) of the Immigration and Nationality Act, 8 U.S.C. § 1225(c). The INS has invoked the summary procedure on the basis of confidential information which, according to the INS, shows that plaintiff is a high-ranking member of a terrorist organization, the Popular Front for the Liberation of Palestine ("PFLP") (with which the PYO is allegedly affiliated), that he has undertaken fundraising and recruiting activities for the PFLP, and that he fought in combat for the PFLP in Lebanon in 1982. Plaintiff claims that the INS's decision to invoke the summary exclusion proceeding (whereby the INS is required to provide him only with notice of the charges against him and an opportunity to submit a written statement to the Regional Commissioner who could make a summary decision without a hearing or further proceedings), rather than to conduct an ordinary exclusion proceeding under Section 236 with an adversarial hearing before an immigration judge, is contrary to law and violates his constitutional rights to due process and free speech. This is the first time that the INS has used Section 235(c) to attempt exclusion of a permanent resident alien.[2]

**1.** In addition to the Immigration and Naturalization Service ("INS"), plaintiff names as defendants Edwin Meese III (Attorney General of the United States), Alan C. Nelson (Commissioner, INS), James Buck (Northern Regional Commissioner, INS), and Robert L. Brown (District Director, District No. 24, INS). For ease of reference, defendants will also be referred to collectively as "INS."

**2.** *See infra* note 32 and accompanying text.

**3.** Plaintiff seeks summary judgment on Counts I through IV of the complaint, which allege that the summary exclusion proceedings (1) are not authorized by the Immigration and Nationality Act, (2) deny plaintiff his due process rights under the fifth amendment, (3) as based on 8 U.S.C. § 1182(a)(27) and (a)(28)(F), violate Section 901(a) of the Foreign Relations Authorization Act, and (4) as based on 8 U.S.C. § 1182(a)(27) and (a)(28)(F), violate plaintiff's first amendment rights.

Plaintiff does not seek summary judgment on Counts V and VI of the complaint because he

The matter comes now before the Court on plaintiff's motions for a preliminary injunction and for partial summary judgment[3] and defendants' motion to dismiss.[4] For the reasons set forth below, defendants' motion to dismiss is denied, and plaintiff's motion for summary judgment is denied, but plaintiff's motion for a preliminary injunction is granted.

## I. Background Allegations [5]

Plaintiff Fouad Yacoub Rafeedie was born in 1957 in El–Bireh on the West Bank of the Jordan River, in what was then Jordan. Declaration of Fouad Yacoub Rafeedie ("Rafeedie Decl.") at ¶ 2. On January 26, 1975, Rafeedie came to the United States on an immigrant visa sponsored by a member of his family who was a United States citizen. *Id.* ¶ 3. Since his initial entry, Rafeedie has been a lawful permanent resident alien of the United States. *Id.* ¶ 4.

Plaintiff currently resides in North Olmstead, Ohio with his wife, who is a United States citizen, and one child, born March 7, 1988. *Id.* ¶ 5. In addition, Rafeedie's mother, a permanent resident alien, lives in Youngstown, Ohio, and he has four brothers, two sisters, and 27 nephews and nieces who are United States citizens living in the United States. *Id.*

concedes that there may be material issues of fact in dispute as to those claims that require discovery. Count V asserts that defendants' actions to exclude plaintiff because of his political beliefs and associations violate his first amendment rights. Count VI alleges that the summary exclusion proceedings were brought in bad faith and violate plaintiff's due process and equal protection rights under the fifth amendment.

**4.** These matters were consolidated for purposes of argument and hearing.

**5.** Though largely undisputed, this factual discussion, derived from plaintiff's affidavit, defendants' "Specific Allegations" against plaintiff attached to the Form I–147, and defendants' briefs to this Court and to the Regional Commissioner, is intended to provide background only and does not constitute findings of fact by the Court. As discussed below, specific findings are not necessary at this point as the parties' motions raise legal or disputed factual issues.

In 1981, plaintiff obtained a bachelor of science degree from Youngstown State University, Youngstown, Ohio. *Id* ¶ 6. He has completed all requirements for a master of science degree in clinical chemistry at Youngstown State University, except for submission of his thesis, which he still intends to pursue. *Id.* Rafeedie is currently employed as assistant manager at Nazer Food Market in Cleveland, Ohio. *Id.* ¶ 8.

Plaintiff has been politically active while living in the United States, particularly with respect to issues involving Arab–Americans. *Id.* ¶ 11. He has been "outspokenly critical of United States' policies in the Middle East particularly with respect to their effect on the rights of Palestinian people." *Id.* He has written numerous articles and appeared on television and radio programs on these issues, and he belongs to a number of Arab and Palestinian political and cultural organizations in this country. *Id.*

Since coming to this country in 1975, plaintiff has desired and intended to become a naturalized United States citizen. *Id.* ¶ 9. He first petitioned to become a naturalized citizen in April 1981.[6] In July of that year, he was called by the INS for an interview. He was accompanied to his interview with the INS officer by two witnesses. *Id.* ¶ 10. He claims that the examiner questioned him and the two witnesses about his political beliefs and associations. *Id.* According to Rafeedie, the examiner told the witnesses that Rafeedie would not be given citizenship because of his political activities. *Id.*

In October 1982, Rafeedie was called by the INS for a second interview. He was asked if he was a member of the Palestinian Liberation Organization or the Communist Party. He replied that he was not. *Id.* ¶ 10. Rafeedie contends that although he was asked again about his political beliefs and associations, the examiner told him that he had passed the test, could become a citizen, and INS would call him in

about a month to attend a naturalization proceeding. *Id.* He signed some forms and paid a $25.00 fee. *Id.*

Plaintiff claims that the INS never called him after this examination. *Id.* When he called the INS office in Cleveland to inquire about whether he would be naturalized, the INS "always responded that either it has no file on me, that my file is still being processed, or that I should not call the INS." *Id.*[7]

On April 7, 1986, plaintiff obtained a reentry permit from the INS in order to take a trip abroad. Rafeedie stated on his application that he intended to travel to Larnaca, Cyprus "because I received a telex that my mother is going through a surgery, and she likes me to attend, because its a major heart surgery." Complaint, Exhibit D, Attachment to Form I–147, Defendants' Specific Factual Allegations of Excludability under Section 235(c) of the Immigration and Nationality Act ("Specific Allegation") No. 9 [sic].

Three days later, he obtained from the Syrian embassy in Washington, D.C. a visa to travel to Syria, which was stamped into his reentry permit. *Id.* at No. 10. According to defendants, plaintiff's mother at that time continued to reside in Ohio, and the hospital in Larnaca, Cyprus neither had facilities for performing major heart surgery nor a record of admittance of his mother. *Id.* at No. 11.

Plaintiff departed for Syria on April 16, 1986. He traveled to Syria with Tarak Mustafa (a United States citizen) and Sulieman Shihadeh (a permanent resident alien), whom defendants contend are also members of the PFLP. The INS alleges that travel arrangements for Rafeedie, Mustafa, and Shihadeh, were made by a California travel agency and that they were seated next to each other on the flight from New York to London. *Id.* at No. 16.

---

**6.** According to the INS, plaintiff did not file his petition for naturalization until October 24, 1982. Specific Allegation No. 4.

**7.** On September 25, 1987, the Common Pleas Court in Youngstown issued an indefinite stay of Rafeedie's naturalization proceeding on the basis that his "eligibility for naturalization is as yet undetermined."

According to defendants, while in Syria, plaintiff, Mustafa, and Shihadeh attended the First Congress of the Palestine Youth Organization, a division of the PFLP. *Id.* at No. 13.

Upon their return to the United States, plaintiff, Mustafa, and Shihadeh were stopped and questioned by INS and Federal Bureau of Investigation officers at the airport in New York. Plaintiff reportedly denied knowing Mustafa and Shihadeh, and told the INS officers that he did not know anything about the PFLP or the PYO. *Id.* at No. 15. According to defendants, a scarf and pin marked with the letters "PYO" were taken from Rafeedie. *Id.*

Shihadeh, on the other hand, reportedly admitted that he was returning from the PYO Congress, that the PYO was a division of the PFLP, and that he had attended the Congress as a representative of the Palestine community in Los Angeles, which had provided funds for the trip. *Id.* at No. 19. Shihadeh had an agenda from the PYO Congress and a card with his picture identifying him as a PFLP member with the rank of "fighter." *Id.* at No. 22. Shihadeh also had a camera containing film, which when developed after being confiscated, showed some photographs of Rafeedie associating with individuals at the PYO conference. One of the photographs on the roll included George Habash, the founder and top leader of the PFLP. *Id.* at No. 21.[8]

Mustafa allegedly told the INS officers that he had known Rafeedie and Shihadeh prior to the April 16 flight. *Id.* at No. 17. Mustafa was found to possess papers titled "Palestine Youth Organization, First General Congress, Damascus, April 1986." *Id.* at No. 18.

After the inspection, Rafeedie was paroled for deferred inspection and permitted to return to North Olmstead, Ohio.

During the deferred inspection of plaintiff in Cleveland, Ohio on May 15, 1986, Rafeedie told the INS that he had not gone to Cyprus because his sister had telephoned him to inform him that his mother's surgery had been cancelled. *Id.* at No. 25. INS officers asked him to provide the name of his sister, the place from which she made the telephone call, and his mother's medical records. *Id.* at No. 26. He did not provide this information. On May 27, 1986, the INS reiterated its request in writing, asking plaintiff for additional information relating to the alleged cancellation of his mother's surgery. *Id.* Rafeedie did not respond.

In a letter dated July 9, 1986, the INS asked Rafeedie to appear personally at the Cleveland INS office to provide the requested information. He responded that he could not appear because he was travelling out of Ohio for his engagement party, and his attorney indicated that he was having back surgery and would not be able to come for at least four weeks. *Id.* at No. 27.

On March 12, 1987, the INS issued to plaintiff a Form I–222 which charged him with being excludable under Sections 212(a)(27) and (29)[9] of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(27), (29). Complaint, Exhibit A. The form recited those two statutory provisions, which provide for excludability of aliens:

(a)(27)—"who the consular officer or the Attorney General knows or has reason to believe seeks to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States"

(a)(29)—who "engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder; or in other activity subversive to the national security, (B)

---

**8.** Shihadeh was later charged with being excludable under 8 U.S.C. § 1182(a)(27), (a)(28), and (a)(29), brought before an immigration judge for an exclusion hearing and excluded. He was deported on June 10, 1986. Specific Allegation No. 23. The record does not reflect what action, if any, has been initiated against Mustafa

(a United States citizen) by any branch of the government.

**9.** The INS subsequently dropped the charges under subsection (a)(29) and added a charge under subsection (a)(28)(F).

engage in any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means, or (C) join, affiliate with, or participate in the activities of any [registered] organization...."

Rafeedie's case was sent to an immigration judge for scheduling of an exclusion hearing. *Id.* at No. 28.

On May 7, 1987, the INS issued to plaintiff an amended Form I–122, which added a charge under 8 U.S.C. § 1182(a)(28)(F). This provision requires the exclusion of aliens:

(a)(28)(F)—"who advocate or teach or who are members of or affiliated with any organization that advocates or teaches ... (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers ... of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage." [10]

After plaintiff's case was assigned to an immigration judge, plaintiff filed several motions, including a motion for specific notice of the basis for the charges against him and a motion for an order requiring defendants to state whether plaintiff was being subjected to electronic surveillance. Complaint, ¶ 25. In a pre-trial order dated December 18, 1987, the immigration judge ordered defendants by January 4, 1988 to more fully apprise Rafeedie of the basis for the charges against him and to answer plaintiff's motion regarding surveillance. Complaint, ¶ 26 and Exhibit C. The immigration judge also set a six-day exclusion trial to commence February 24, 1988. *Id.*

On December 31, 1987, stating that it had received new confidential information requiring Rafeedie's excludability, the INS issued a Form I–147 to plaintiff, temporarily excluding him under Section 235(c) of the Immigration and Nationality Act on the basis of 8 U.S.C. § 1182(a)(27) and (a)(28)(F). The INS informed plaintiff that

[s]ubsequent to the issuance of the amended Form I–122 on May 7, 1987, which brought your case for consideration to an immigration judge, INS received confidential information which indicates that you are excludable from the United States under sections 212(a)(27) and (28)(F) of the Act, 8 U.S.C. 1182(a)(27) and (28)(F). The confidential information establishes that your admission into the United States would be prejudicial to the public interest, safety, or security. Disclosure of the confidential information would be prejudicial to the public interest, safety or security.

*Id.* at 7–8. Attached to the Form I–147 were eight pages of "specific factual allegations of excludability," which summarized Rafeedie's status as a permanent resident alien, the circumstances surrounding his trip to Syria, the immigration inspection of his traveling companions Mustafa and Shihadeh, and the procedural history of the exclusion proceedings. The Form I–147 informed plaintiff that his application for admission to the United States, "together with any written statement and accompanying information you or your representative desire to submit to this office within 30 days, will be referred to the Regional Commissioner for consideration." *Id.*

The confidential information that prompted the invocation of the Section 235 proceedings was not described in the Form I–147 or the attachments. Defendants have since elaborated on its nature. The INS contends that the "confidential information discloses that Rafeedie is a high ranking member of the PFLP, in the United States. He has been active in both fund raising and recruiting activities for the PFLP. He fought with the PFLP in Lebanon in 1982, and claimed to have been wounded in combat." [11] The confidential information is classified material and de-

---

**10.** The amended Form I–122 quoted only subparagraphs (ii)–(iv) of 8 U.S.C. § 1182(a)(28)(F).

**11.** This description of the nature of the confidential information is provided in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment at 21 (filed March 11, 1988), but it does not appear that it was ever so described to plaintiff at any earlier time.

fendants continue to contend that disclosure of the confidential information confirming these assertions would be prejudicial to the public interest, safety, or security of the United States. Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defs. Opp."), at 39 n. 18.

In his declaration in support of his motions, plaintiff denies that he is or has even been "a member of or in any way affiliated with the Palestinian Liberation Organization or the Popular Front for the Liberation of Palestine." Rafeedie Decl. ¶ 15. He also states: "I am not now nor have I ever been a member of or in any way affiliated with any organization that engages in or supports terrorism, nor have I ever engaged in any terrorist activity myself." *Id.* ¶ 16.

On January 5, 1988, the immigration judge granted a motion by the INS to close the immigration hearing because the INS had initiated summary exclusion procedures. Complaint, ¶¶ 27, 30, and Exhibits D, E. On January 22, 1988, District Director Robert L. Brown granted plaintiff an extension of time until February 25, 1988 to submit a written statement in response to the INS's allegations. Complaint ¶ 31 and Exhibit F. That deadline was further extended in light of this litigation.[12] On March 11, 1988, the INS served on Rafeedie and his counsel a copy of "Administrative Record: INS 'Public Submission' to Northern Regional Commission[er]," which comprises a 46-page brief arguing that Rafeedie should be excluded, and various exhibits and attachments, including the transcript of Shihadeh's exclusion hearing. Defs. Opp., Exhibit 2.

With this background in mind, it is important to examine the procedural differences between a summary exclusion proceeding under Section 235 and an ordinary exclusion proceeding conducted under Section 236 before examining the merits of defendants' motion.

When an alien enters or seeks to reenter the United States from another country, the examining immigration officer at the port of arrival is required to detain for further inquiry "every alien who may not appear ... to be clearly and beyond a doubt entitled to land." 8 U.S.C. § 1225(b). If the examining immigration or special inquiry officer believes that an alien is excludable under 8 U.S.C. § 1182(a)(27), (28), or (29), the alien "shall be temporarily excluded." Section 235(c), 8 U.S.C. § 1225. The case is then reported without further inquiry to the Attorney General[13] "together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith." *Id.*[14] At this point, the Regional Commissioner may direct that the alien either be given a hearing before an immigration judge, or, if confidential information is involved, be accorded only a summary proceeding.[15]

The "ordinary" procedure for excluding aliens under Section 236 provides that, after an alien is issued a notice of a hearing (Form I-122), 8 C.F.R. § 235.6(a), an immigration judge[16] conducts an exclusion hearing, with presentation of evidence, witnesses, and cross-examination. 8 U.S.C. § 1226; 8 C.F.R. § 236.1. The alien must be informed of his right to counsel and has the right to open the hearing to the public and press. A complete record of the proceeding is kept. 8 C.F.R. § 236.2(e). If the alien is a permanent resident, the burden of proving excludability is on the

---

**12.** The INS has voluntarily agreed to defer the deadline for Rafeedie's response to the exclusion charges until ten days following this Court's decision on the pending motions.

**13.** The Attorney General has, in turn, delegated this authority to the Regional Commissioners. 8 C.F.R. § 235.8(b).

**14.** Under the regulations promulgated under Section 235(c), the alien is to be notified by personal service of a Form I-147 of his temporary exclusion and of his "right to make written representations." 8 C.F.R. § 235.8(a).

**15.** *See Azzouka v. Sava,* 777 F.2d 68, 72 (2d Cir.1985).

**16.** Immigration judges and "special inquiry officers" are administrative judges under an executive office of the Department of Justice, distinct from the INS. *See* 8 C.F.R. §§ 3.9, 3.10.

government. *Kwong Hai Chew v. Rogers,* 257 F.2d 606 (D.C.Cir.1958).[17] The decision of the immigration judge must include a discussion of the evidence and findings as to excludability. 8 C.F.R. § 236.5. And, the order of the immigration judge is appealable to the Board of Immigration Appeals. *Id.* §§ 236.6, 236.7.

In contrast, if the Regional Commissioner is satisfied that the alien is excludable

> on the basis of information of a *confidential nature,* the disclosure of which the Attorney General, in the exercise of his discretion, and after consultation with the appropriate security agencies of the Government, concludes would be *prejudicial to the public interest, safety, or security,* he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer.

*Id.* (emphasis added).[18] The regulations promulgated under Section 235(c) provide that this decision of the Regional Commissioner must be in writing and signed by him. If the decision contains confidential matter, it need not, however, be served on the alien, 8 C.F.R. § 235.8(c), and a separate order "showing only the ultimate disposition of the case shall be signed by the regional commissioner and served on the alien." *Id.* The regulations further provide that the alien cannot appeal the decision of the Regional Commissioner. In

short, Congress provided for drastically different administrative proceedings where confidential information forms the basis for the alien's excludability. In this action, Rafeedie challenges the constitutionality of this legislative scheme as applied to permanent resident aliens.

## II. Motion To Dismiss [19]

Defendants move to dismiss this action on the basis that plaintiff has neither exhausted his administrative remedies under Section 106(c) of the Immigration and Nationality Act nor in accordance with the judicial exhaustion doctrine. Defendants' statutory argument is examined first.[20]

### A. Statutory Exhaustion: Section 106(c) of the INA

■ Section 106(c) of the Immigration and Nationality Act provides that:

> An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations....

8 U.S.C. § 1105a(c). If it applies, the exhaustion requirement of Section 106(c) is jurisdictional. *Dhangu v. INS,* 812 F.2d 455 (9th Cir.1987); *Garcia–Mir v. Smith,* 766 F.2d 1478, 1489 (11th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986). Once a final order of

**17.** In contrast, a nonresident alien bears the burden of establishing his right to enter the United States. 8 U.S.C. § 1361.

**18.** Even if the Regional Commissioner directs that an alien temporarily excluded be given a hearing or a further hearing before an immigration judge, once "confidential information, not previously considered in the matter, is adduced supporting the exclusion of the alien under paragraph (27), (28), or (29) of section 212(a), of the Act, the disclosure of which, in the discretion of the immigration judge, may be prejudicial to the public interest, safety, or security, the immigration judge may again temporarily exclude the alien ... and further action shall be taken as provided in this section." 8 C.F.R. § 235.8(d).

As described above, the INS initially directed that Rafeedie's excludability be determined through a hearing before an immigration judge. Defendants' claim to have subsequently received

confidential information about Rafeedie's participation in the PFLP, however, prompted the INS to terminate that hearing and begin a summary exclusion proceeding before the Regional Commissioner.

**19.** In viewing a motion to dismiss, of course, the factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1357, p. 594 (1969).

**20.** The courts may not apply judicial exhaustion principles where a statutory exhaustion requirement is found applicable. *Assiniboine and Souix Tribes v. Board of Oil and Gas Conservation of Montana,* 792 F.2d 782, 790 (9th Cir. 1986); *Rodrigues v. Donovan,* 769 F.2d 1344, 1348 (9th Cir.1985); *Reid v. Engen,* 765 F.2d 1457 (9th Cir.1985).

exclusion has issued, Section 106(b) provides that an alien may obtain judicial review through a petition for habeas corpus. 8 U.S.C. § 1105a(b).[21]

Plaintiff argues that the plain language of the provision renders it non-applicable because no order of deportation has issued, and alternatively that Section 106(c) does not apply because plaintiff challenges the summary exclusion procedures on broad statutory and constitutional grounds. Only the second argument is persuasive.

Read literally, Section 106(c) might suggest that exhaustion is only required where an order of exclusion has *issued* against an alien, but that *until* such a final order is issued, an alien may bring his complaints about the proceedings directly to the courts. Such an superficial interpretation of Section 106(c) does not comport with the congressional intent that "separate and preliminary" matters be included under Section 106(c)'s prohibition on early judicial review. *Louis v. Meissner*, 532 F.Supp. 881, 885–89 (S.D.Fla.1982).[22]

While, generally, preliminary or separate matters not part of a final exclusion order may not be reviewed directly by the courts, plaintiff's challenge to the Section 235(c) proceeding in this case is not such a "preliminary or separate" matter. Rather, it is a wholesale attack on the INS's decision to bring summary proceedings against him at all and a challenge to the constitutional adequacy of those proceedings independent of whether the INS fully complies with its statutory duties in carrying out the procedure set forth by Congress. Thus, unlike the claims dismissed in *Louis,* plaintiff's allegations here include that the remedies as provided by the statute and regulations are inadequate or ineffective. *Id.* at n. 8; *see also Ramirez–Osorio v. INS,* 745 F.2d 937, 939 (5th Cir.1984) (citing *NLRB v. Industrial Union of Marine and Shipbuilding Workers of America,* 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 1722–23 n. 8, 20 L.Ed.2d 706 (1968)). In short, the question sought to be litigated is simply not within the express language of the statutory exhaustion requirement. *Weinberger v. Salfi,* 422 U.S. 749, 761–62, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975); *see also Cheng Fan Kwok v. INS,* 392 U.S. 206, 210, 215, 88 S.Ct. 1970, 1973, 1975, 20 L.Ed.2d 1037 (1968) ("Congress quite deliberately restricted the application of § 106(a) to orders entered during proceedings conducted ... or directly challenging deportation orders themselves"); *Andres v. INS,* 460 F.2d 287, 288 (6th Cir.1972).

**21.** In contrast, final orders of *deportation* are generally reviewable only by the Court of Appeals. 8 U.S.C. § 1105a. *Landon v. Plasencia,* 459 U.S. 21, 26, 103 S.Ct. 321, 326, 74 L.Ed.2d 21 (1982).

**22.** In *Louis v. Meissner,* 532 F.Supp. 881 (S.D. Fla.1982), Haitian refugees being detained in the United States pending exclusion proceedings challenged the INS's actions during preliminary interviews and the exclusion proceedings on both statutory and constitutional grounds, claiming in particular that the INS has denied them their right to counsel, to public hearings, and to seek political asylum.

Plaintiffs argued that the district court had jurisdiction even though final orders of exclusion had not been entered because Section 106(c) was not intended to limit review of determinations of matters "separate or preliminary" to final exclusion orders. *Id.* at 886.

After thoroughly considering the policy reasons behind Section 106(c) and the general principles of exhaustion, the court concluded that Congress intended Section 106(c) "to restrict, not expand, judicial relief for aliens," and that interpreting the statute to allow Plaintiffs to challenge "separate or preliminary matters" without complying with the statute's requirements would be antithetical to congressional intent. *Id.* at 888.

The court granted in part the INS's motion to dismiss for lack of exhaustion, dismissing those claims that attacked the policies and procedures "used during and incident to their exclusion proceedings." *Id.* The court maintained jurisdiction, however, over those claims challenging under the Administrative Procedure Act the INS's change in policy regarding the order in which the Haitian refugees would be subjected to exclusion proceedings and the manner in which such proceedings would be conducted, plaintiffs' claim that they were being denied access to counsel in connection with the exclusion proceedings in violation of the first amendment, and plaintiffs' equal protection claim that the challenged policy was applied to Haitian but not other refugee groups. *See also Louis v. Nelson,* 544 F.Supp. 973 (S.D.Fla.1982), *appealed on other grounds sub nom. Jean v. Nelson,* 727 F.2d 957 (11th Cir.1983), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

This conclusion is confirmed by examining the purposes of the Section 106 exhaustion requirement. Exhaustion serves (1) to promote administrative efficiency by preventing premature interference with the agency processes, (2) to encourage respect for executive autonomy by allowing an agency opportunity to correct its own errors, (3) to facilitate judicial review by affording courts the benefits of an agency's experience and expertise, and (4) to serve judicial economy by having the agency compile the factual record. *Salfi*, 422 U.S. at 765, 95 S.Ct. at 2466; *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir.1974); *see also Althone Industries v. Consumer Product Safety Comm'n*, 707 F.2d 1485, 1488 (D.C.Cir.1983). None of these purposes would be served here by requiring Rafeedie to first complete the Section 235 proceedings before seeking review through a habeas petition.

While this litigation interrupts the administrative process for the INS, the weight accorded this interest is diminished in light of the agency's own lack of expedition in seeking to exclude Rafeedie. Over a year elapsed between plaintiff's trip to Syria and the agency's decision to seek to exclude Rafeedie through a summary procedure. And, in determining to so proceed, the agency itself abruptly interrupted an ongoing ordinary exclusion proceeding before an immigration judge. Even though the reasons for the INS's decision are not at issue here, concerns arising from further interruption under these circumstances are minimal, particularly where the agency recognizes that this case raises important issues of first impression.

The other purposes of exhaustion are also not furthered where, as here, plaintiff's challenge is a facial attack on the statutory scheme defendants are attempting to apply to him; the questions raised by such a challenge are outside the agency's area of competence and expertise.

*Salfi*, 422 U.S. at 767, 95 S.Ct. at 2467 (purposes of exhaustion not served where agency enjoys no expertise in matters of constitutional law); *Panola Land Buyer's Ass'n v. Shuman*, 762 F.2d 1550, 1557 (11th Cir.1985) (exhaustion not required where no administrative procedure directed at complainant's claims); *Garcia–Mir*, 766 F.2d at 1489 n. 13; *see also Cannon v. University of Chicago*, 441 U.S. 677, 706 n. 41, 99 S.Ct. 1946, 1962 n. 41, 60 L.Ed.2d 560 (1979); *cf. Dhangu*, 812 F.2d at 460 (exhaustion required where procedural errors could be corrected by administrative appeal and where due process claim involved factual questions that court was not in a position to resolve).

In addition, exhaustion is unhelpful where the agency's development of a factual record would not aid a court in reviewing a habeas petition.[23] Under Section 235(c), there is no requirement that the Regional Commissioner state the reasons for her decision, there is no hearing (and hence no transcript of the evidentiary basis for the decision), and the regulations require that the confidential information not be disclosed in the record. With such a barren record, any future reviewing court would not benefit from the agency's experience and expertise. *See Bagues–Valles v. INS*, 779 F.2d 483, 484 (9th Cir.1985) (exhaustion not required where due process claims made by plaintiffs did not concern "procedural errors correctable by the administrative tribunal"); *cf. Dhangu*, 812 F.2d at 460; *Rogue–Carranza v. INS*, 778 F.2d 1373, 1374 (9th Cir.1985) (initial consideration of due process claim by agency would develop record for appeal); *Garcia–Mir*, 766 F.2d at 1487.

Thus, defendants' arguments that "even if the Regional Commissioner eventually finds Mr. Rafeedie excludable, the basis for that decision cannot now be predicted" and "[j]udicial review of the ultimate decision will be controlled by the reasoning of the holding and the evidence relied upon to

---

**23.** This conclusion that the INS is unable to develop a helpful factual record does not mean that there are not disputed issues of fact in this case. As discussed below, the Court finds that such issues do exist and preclude summary judgment. Those fact issues, however, are not the sort that would or could be addressed in the record of a Section 235(c) proceeding.

support the decision," Defendants' Reply, at 4, is simply disingenuous in this case.[24] Where as here the attack is a statutory and constitutional one, requiring plaintiff to participate in the summary administrative proceedings prior to judicial review would not serve the purposes of exhaustion. As the Supreme Court noted in *Califano v. Sanders*, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977), "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions.... [W]hen constitutional questions are in issue, the availability of judicial review is presumed."

Thus, neither the plain language nor purpose of Section 106(c) bars plaintiff's suit.[25] Defendants suggest, however, that even if this statutory exhaustion requirement does not apply, plaintiff's suit should also be barred because of the principles of judicial exhaustion.

### B. Judicial Exhaustion

The same reasoning set forth above with regard to the purposes behind Section 106(c) exhaustion applies with equal force in the context of the judicial doctrine of exhaustion. In addition, however, waiver of the latter requirement is appropriate where a court finds in its discretion [26] that requiring exhaustion would be a futile gesture.

Judicial exhaustion is a flexible doctrine, to be applied with "an understanding of its purposes and of the particular administrative scheme involved." *Althone*, 707 F.2d at 1488. Where it is futile or even highly unlikely that an agency will change its mind with further proceedings, exhaustion need not be required. *Atlantic Richfield Co. v. United States Department of Energy*, 769 F.2d 771, 782 (D.C.Cir.1984); *Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496, 501 (9th Cir.1980).

Exhaustion in this case would be futile because Rafeedie has no realistic chance of prevailing before the Regional Commissioner.[27] Defendants argue that, at least theoretically, the Regional Commissioner might decide not to exclude Rafeedie on the basis of the confidential information. While futility arguments are to be generally viewed with circumspection, *Salfi*, 422 U.S. at 766, 95 S.Ct. at 2467, in light of the record in this case, the possibility of a decision in favor of Rafeedie by the Regional Commissioner is, indeed, only theoretical. The INS

**24.** Defendants' fear that exercise of judicial review in this case will encourage other aliens to allege violations of due process in the hope of delaying or halting INS proceedings, Defendants' Reply, at 2, is unfounded. Plaintiff has raised serious and substantial statutory and constitutional questions in this case regarding the decision of the INS to invoke summary proceedings against him. Defendants admit that this is the first attempt to apply Section 235(c) as presently written to a permanent resident alien. Further, the severely summary nature of the proceeding under Section 235(c) and the consequences to Rafeedie of being excluded prior to any filing of a habeas petition makes plaintiff's predicament particularly compelling. "Due process" is not a talismanic term that guarantees waiver in all cases of the exhaustion requirement.

*See Reid v. Engen,* 765 F.2d 1457, 1461 (1985).

**25.** The Court does not accept plaintiff's argument, however, that exhaustion should be waived because the INS's action here is patently illegal or basically lawless. Plaintiff's Opposition, at 12 (citing *Oestereich v. Selective Service Board,* 393 U.S. 233, 242, 89 S.Ct. 414, 418, 21 L.Ed.2d 402 (1968)). Whether the agency's action is "illegal" is an issue to be addressed in this action, not one already determined. The INS has followed statutory procedures set forth by Congress, and even through the statute (and the agency's regulations under it) may ultimately be found unconstitutional or improper, the agency's action here cannot be characterized as "lawless."

**26.** Judicial imposition of the exhaustion requirement is discretionary. *Althone Industries v. Consumer Product Safety Commission,* 707 F.2d 1485, 1488 (D.C.Cir.1983); *NLRB v. Industrial Union of Marine and Shipbuilding Workers,* 391 U.S. 418, 419, 426 n. 8, 88 S.Ct. 1717, 1719, 1722–23 n. 8, 20 L.Ed.2d 706 (1968).

**27.** Plaintiff also argues that it is a foregone conclusion that Rafeedie will be excluded under the Section 235(c) procedures because the Regional Commission is "an integral part" of the INS enforcement apparatus and there is, therefore, "not even a semblance of independence." Plaintiff's Opposition, at 2. While this argument may be relevant to plaintiff's due process concerns, discussed below, it adds little to his futility argument.

has already made it clear—through the Form I–147, its lengthy brief to the Regional Commissioner, and before this Court—that it strongly believes that plaintiff is excludable based on the confidential information indicating his affiliation with the PFLP. The INS has already successfully excluded Rafeedie's alleged traveling companion Sulieman Shihadeh through an ordinary exclusion proceeding, and the INS has averred strong ties between the two men. Further, the INS concedes that during the Section 235(c) proceeding, plaintiff will have no opportunity to directly rebut the confidential information—the very evidence that purports to establish his excludability. Rafeedie's pursuit of his administrative remedies would indeed be futile.

Of further concern is plaintiff's argument that he will be irreparably injured should he be required to go through the Section 235(c) proceeding and then to file a habeas corpus petition requesting relief. In the interim, plaintiff claims injury will result to his personal liberty, his ability to represent himself, and to his first amendment rights.

While the INS represents that, if Rafeedie were found excludable by the Regional Commissioner, exclusion would be delayed for ten days to provide plaintiff the opportunity to file a habeas petition, defendants make no such reassurances with regard to plaintiff's immediate loss of his right to work or the certainty of detention. Further, even though the INS's representation to plaintiff and this Court that it will delay deportation to facilitate judicial review is commendable, such a grace period appears to be the result of a purely discretionary, *ad hoc* decision made after the commencement of this litigation; there is no express protection for plaintiff in this regard in either the statute or the regulations. Thus, even should he ultimately prevail on a habeas petition, once he is ordered excluded by the INS, he "stands to lose the right 'to stay and live and work in this land of freedom' " and the "right to rejoin [his] immediate family, a right that ranks high among the interests of the individual."

*Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982). Rafeedie's interest in not losing his employment and in retaining his personal freedom are indeed "weighty."

Plaintiff further argues that continuation of the Section 235(c) proceeding would chill his first amendment rights by discouraging him from speaking out on Palestinian rights issues. Plaintiff has failed to show, however, how the summary procedure chills his first amendment rights any more than would a Section 236 procedure before an immigration judge, which was already underway when the INS decided to convert to the summary procedure. While plaintiff raises important concerns about whether his speech and associational activities may have influenced the INS to delay or deny his *naturalization* petition (which is not before this Court for review), the record reflects that the decision to place him in Section 235(c) proceedings was based on the confidential information allegedly showing his membership in the PFLP and *not* on the speech and associational activities he describes in his affidavit. Plaintiff has thus not made the necessary allegations that he has restricted his speech and association directly related to the basis for the INS's charge, *i.e.,* membership, activity, or advocacy associated with the PFLP, PYO, or PLO. *Cf. Wolff v. Selective Service Local Board,* 372 F.2d 817, 825 (2d Cir.1967).

Plaintiff further alleges that the right to counsel will be impaired because he will be forced to reveal his entire defense to the INS prior to a habeas proceeding.[28] In theory, an alien required to go through the summary procedure risks inartfully displaying his hand to the INS, while the agency is not required concomitantly to reveal its confidential evidence against him. Or, plaintiff may decline to make any defense at all, resulting in a completely one-sided proceeding and the virtual certainty of an exclusion order. These same risks are incurred, however, during an ordinary exclusion hearing when confidential information is involved. Although an alien has

---

**28.** Plaintiff does not attack here the absence of a requirement that an alien have a right to counsel during the Section 235 proceedings. *Cf.*

8 C.F.R. § 236.2(a) (ordinary exclusion proceedings).

an opportunity to confront that part of the government's case that is not confidential, there, too, plaintiff may well never see the most crucial part of the government's case against him.[29] Thus, any impairment of Rafeedie's right to defend himself is difficult to predict.

In summary, the Court finds that the exhaustion provision of the Immigration and Nationality Act, Section 106(c), does not apply in this case. Further, the purposes of exhaustion as a judicial doctrine would not be served by allowing the Section 235(c) proceedings to continue. Accordingly, defendants' motion to dismiss for lack of exhaustion is denied.[30]

### III. Plaintiff's Motion for Preliminary Injunction

To justify injunctive relief, plaintiff must show (1) a substantial likelihood of success on the merits, (2) that he will suffer irreparable injury if such relief is not granted, (3) that defendants will not be unduly harmed if such relief is granted, and (4) that the public interest favors the grant of such relief. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958). The test is a flexible one. Injunctive relief may be granted "with either a high likelihood of success and some injury or *vice versa.*" *Population Institute v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986). And, plaintiff need not establish an absolute certainty of success: "it will ordinarily be enough that the plaintiff has raised serious legal questions going to the merits, so serious, substantial, difficult as to make them fair ground for litigation and thus for

---

**29.** For example, during the hearing on excludability of Shihadeh, the immigration judge inspected confidential information *in camera.* Defendants' Exhibit 42.

**30.** Defendants also suggest that the doctrines of avoidance, ripeness, and *Younger* should bar this action. The Court finds this spray of jurisdictional arguments off the mark.

The doctrine of avoidance dictates that courts should not pass upon constitutional questions "unless such adjudication is unavoidable." *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985) (citing *Spector Motor Co. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)). This cautionary principle is not a basis for prematurely dismissing a complaint that raises both constitutional and statutory arguments but rather is to be kept in mind when the merits of this action are addressed. Thus, as plaintiff concedes, the Court should decide whether Section 235(c) applies to plaintiff as a matter of statutory construction and whether 8 U.S.C. § 1182(a)(27) and (a)(28)(F) are inconsistent with § 901(a) of the Foreign Relations Act before reaching plaintiff's first and fifth amendment claims.

Neither is the ripeness doctrine a basis for dismissal. Defendants argue that this challenge to an on-going administrative enforcement action is not ripe for judicial review because it does not present an issue "fit for judicial resolution" and plaintiff has not shown that "serious irremedial injury" will result absent judicial intervention. Motion to Dismiss, at 13 (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). The Court does not agree. The issues presented are purely legal or ones which the agency cannot address; further the consequences of exclusionary proceedings for plaintiff are indisputably serious. Ripeness concerns do not arise here where the agency's policy has crystallized and the issues are concrete. *See Assiniboine and Sioux Tribes v. Board of Oil and Gas,* 792 F.2d 782, 789 (9th Cir.1986). The agency has invoked clearly defined enforcement procedures against plaintiff that will terminate with a specific sanction and during which plaintiff has no opportunity to interpose his constitutional arguments. *Cf. Hastings v. Judicial Conference of the United States,* 770 F.2d 1093 (D.C.Cir. 1985), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). Neither has the government shown how "the court or agency would benefit from the postponement of review until the agency action or policy in question has assumed either a final or more concrete form." *Better Government Association v. Department of State,* 780 F.2d 86, 92 (D.C.Cir.1986).

Defendants' contention that the doctrine enunciated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), applies here is also unpersuasive. Under *Younger,* federal courts are precluded from enjoining contemporaneous state court criminal proceedings. Defendants have not shown that *Younger* applies to the instant context. There is not a similar federalism concern here where the enforcement action is civil and is undertaken by a co-ordinate branch of the federal government. No disrespect of a co-equal branch of government is implied where a court waives compliance with an administrative procedure that is neither intended nor able to resolve the claims presented. *Ticor Title Ins. Co. v. Federal Trade Comm'n,* 814 F.2d 731, 750 (D.C.Cir.1987) (Green, Joyce Hens, concurring).

more deliberative investigation." *Id.* (citing *Holiday Tours,* 559 F.2d at 844).

At the same time that the Court evaluates whether plaintiff has established a substantial likelihood of success on the merits, plaintiff's request for summary judgment on Counts I through IV of the complaint will be considered. Summary judgment is appropriate when there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A. Likelihood of Success on the Merits

Congress' broad authority over immigration matters has often and firmly been upheld by the Supreme Court. *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). "[S]ignificant countervailing national concerns ... have led our immigration law to place primary decision-making authority about such a problem squarely into the hands of the political branches," *Garcia–Mir,* 766 F.2d at 1484, and the power of Congress over aliens is subject only to narrow judicial review. *Fiallo,* 430 U.S. at 792, 97 S.Ct. at 1478. But, even though the government's interest "in protecting our sovereignty is at its strongest and ... individual claims to constitutional entitlement are the least compelling" in the area of entry decisions, *Jean v. Nelson,* 472 U.S. at 875, 105 S.Ct. at 3009 (Marshall, J., dissenting), "the Court has refused to characterize the authority of the political branches as wholly unbridled." *Id.*

The words of Justice Frankfurter in *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), are particularly apt here where the important issues of personal liberty and national security raised in this case must be viewed within the confines of years of congressional decisionmaking and judicial precedent:

> [M]uch could be said for the view that due process places some limitations on congressional power in this area 'were we writing on a clean slate,' ... [b]ut the slate is not clean. As to the extent of the power of Congress under review, there is not merely a page of history ... but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of those policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government. ... We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens....

*Id.* at 530–32, 74 S.Ct. at 642–43, *quoted in Kleindienst v. Mandel,* 408 U.S. 753, 766–67, 92 S.Ct. 2576, 2583–84, 33 L.Ed.2d 683 (1972). As the Court further observed in *Harisiades v. Shaughnessy,* 342 U.S. 580, 588, 72 S.Ct. 512, 518, 96 L.Ed. 586 (1951), "[t]hat aliens remain vulnerable to expulsion after long residence is a practice that bristles with severities, but it is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign state."

### 1. Count I: Are Section 235(c) Proceedings Against Plaintiff Authorized by the Immigration and Nationality Act?

Plaintiff contends that Section 235(c) does not apply to permanent resident aliens as a matter of statutory construction. He points out that the INS has never before used Section 235(c) against a resi-

dent alien[31] and that nothing in the plain language or the legislative history of Section 235 suggests that it applies to resident aliens. The Court is unpersuaded.

A statutory analysis must, of course, start with the plain language of the legislation itself. *United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Absent a clearly expressed intention to the contrary, that language must be given its ordinary meaning. *James*, 106 S.Ct. at 2131. Section 235(c) states that it applies to *"any* alien." There is no express or implied exception to this blanket terminology. Plaintiff has not shown any facial ambiguity or contrary legislative intent that would permit avoidance of the ordinary meaning of the terms used. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (quoting *INS v. Phinpahtya*, 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984)). Furthermore, to conclude that "alien" in this part of Section 235 never includes returning permanent resident aliens would create interpretational problems in other sections of the statute where the term "alien" is also used without qualification. Where Congress exempted permanent resident aliens from the terms of the Immigration and Nationality Act, it did so explicitly. *See, e.g.,* § 212(c), 8 U.S.C. § 1182(c).

Plaintiff's real quarrel with Section 235(c) is a constitutional, not a statutory, one. Plaintiff's heavy reliance on *Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), (discussed extensively below), for his statutory argument underscores its artificiality. While the Supreme Court in *Chew* cast its conclusion in statutory terms, the decision itself and subsequent cases have made clear that the rationale was a constitutional one; even though the Court did not hold the regulation facially unconstitutional, it found that the statute could not constitutionally be applied to Chew.[32] *See Landon v. Plasencia*, 459 U.S. 21, 33, 103 S.Ct. 321, 329–30, 74 L.Ed.2d 21 (1982); *Rosenberg v. Fleuti*, 374 U.S. 449, 460, 83 S.Ct. 1804, 1811, 10 L.Ed.2d 1000 (1963). The same rationale would apply here should plaintiff prevail on the merits of his constitutional claims. The decision would be grounded on constitutional not statutory principles.[33]

Thus, the Court concludes that, though the application of Section 235(c) to plaintiff may well be infirm for other reasons discussed in this Opinion, it does not appear flawed as a matter of statutory interpretation. That the INS has not previously applied Section 235(c) to returning permanent resident aliens (including, for example, Rafeedie's alleged traveling companion Shihadeh), does not alone bar its application to Rafeedie.[34]

## 2. Count II: Does Application of Section 235(c) to Plaintiff Violate the Due Process Clause?

An analysis of whether the INS's decision to apply Section 235(c) proceedings to

---

**31.** *See* Declaration of Charles Gordon, former General Counsel of the INS, stating that he is not aware of any previous instances of such an application. Defendants do not dispute that Section 235(c) has not been so used. The Court is only aware of one case apparently to the contrary. *See United States ex rel. Kasel de Pagliera v. Savoretti*, 139 F.Supp. 143 (S.D.Fla. 1956) (deciding two cases, the second of which involved a permanent resident alien reentering the United States from a trip to Australia and holding, without analysis, that application of Section 235(c) violated his due process rights).

**32.** As discussed further below, the summary exclusion procedure at issue in *Chew* and *Mezei* was the regulatory predecessor of Section 235(c). *See infra* notes 36 & 38.

**33.** The cases cited by plaintiff where courts narrowly construed statutes to avoid constitutional issues, *see* Plaintiff's Reply, at 6–7 & n. 6, are unhelpful here where the plain language of the statute supports its application to plaintiff and his only strong argument against its application is a constitutional one.

**34.** The agency's practice inevitably raises other concerns, however, particularly as the INS has yet to explain its abrupt change in position. Counsel for the INS, in fact, stated during Shihadeh's hearing that "in this particular case the alien is a lawful permanent resident, [and] he is entitled to a hearing." Transcript at 62 (Exhibit 42 to Defendants' Exhibit 2).

plaintiff violates any right he might have to due process requires a preliminary determination of whether plaintiff, as a permanent resident alien seeking to reenter the country after a trip abroad, is even entitled to due process. As explained below, the Court finds that further factual exploration is necessary before a complete answer to this question can reasonably be made.

As background, it is important to explore first the important legal distinctions between different classifications of aliens. In the eyes of the nation's immigration laws and the due process clause, not all aliens are viewed similarly. To begin with, a fundamental distinction between *excludable* aliens and *deportable* aliens "permeates our immigration law." *Garcia–Mir*, 766 F.2d at 1483; *see also Plasencia*, 459 U.S. at 26, 103 S.Ct. at 325. Deportable aliens have succeeded in either legally or illegally entering the country. Excludable aliens, on the other hand, are those who either are seeking initial admission to the United States or re-entering from a trip abroad, but who have not been granted permanent entry into the United States. Under the "entry fiction" employed by the INS and the courts, re-entering aliens not yet granted entry are legally considered to be detained at the border. *Garcia–Mir*, 766 F.2d at 1484.

In terms of due process protection, the courts have distinguished between two types of aliens. Permanent resident aliens who have continuously and physically resided in the United States are to be accorded the same due process rights as United States citizens. "It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protections of the Fifth Amendment. He may not be deprived of his life, liberty or property without due process of law." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953). "Although Congress may prescribe conditions for his expulsion and deportation not even Congress may expel him without allowing him a fair opportunity to be heard." *Id.* at 597–98, 73 S.Ct. at 478. In contrast, aliens seeking initial admission to this country are entitled only to whatever process Congress determines to give them. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) ("*Mezei*").[35] The central issue presented in this case is what process is due an alien like Rafeedie who falls between these two extremes. As discussed more fully below, in two seminal cases, *Chew*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576, and *Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956, the Supreme Court has treated the re-entering alien as either a "continuously residing" or a new entrant depending on the circumstances of that alien's trip abroad. As the Supreme Court observed in *Plasencia*, 459 U.S. at 32, 103 S.Ct. at 329, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."

In *Chew*, the Supreme Court held that the re-entering alien could not be subjected to a summary exclusion proceeding. Understandably, some of the language in *Chew* is heavily relied on by plaintiff, but the Court's broad declarations of Chew's

---

**35.** Section 235(c) and its predecessor have been applied to *non* resident aliens with court approval. *See, e.g., United States ex rel. Kasel de Pagliera v. Savoretti*, 139 F.Supp. 143 (S.D.Fla. 1956); *but see Jean v. Nelson*, 472 U.S. at 873, 105 S.Ct. at 3007 (Marshall, J., dissenting, pointing out that *Mezei* has been heavily critized and suggesting that excludable aliens do enjoy fifth amendment protections).

In the first of the two cases decided in *Savoretti*, 139 F.Supp. 143, involving a nonresident alien, the court granted the writ of habeas corpus because the INS had not complied with the Section 235(c) requirement that petitioner have suitable opportunity to present a written statement and accompanying information. In the second case, involving a permanent resident alien who was reentering the United States after a trip to Australia, the court also granted the writ, finding that the application of Section 235(c) to him without notice of charges and a hearing violated due process. There was no discussion in the latter case regarding the nature or duration of the alien's trip abroad. *See supra* note 32.

right to due process must be examined in light of the specific factual context of that case to determine if such reliance is warranted.

Petitioner Chew was a Chinese seaman originally admitted to the United States in 1945. He married a native American, bought a home and resided in New York. In 1949, he became a permanent resident of the United States. During World War II, he served in the United States Merchant Marine, and in 1950, he filed a petition for naturalization. While his petition was pending, Chew joined the Coast Guard as a seaman on a merchant vessel. He became chief steward on an American vessel based in New York City that was to make calls at several foreign ports in the Far East. When the vessel arrived in San Francisco after four months' voyage, an immigration inspector ordered Chew "temporarily excluded" as an alien whose entry was deemed prejudicial to the public interest.[36] When the vessel arrived in New York, Chew was not permitted to land. The Attorney General did not inform Chew of the nature of the confidential information that had prompted the accusations against him; Chew was also denied an opportunity to be heard in opposition to the order for his exclusion. He then sought a petition for a writ of habeas corpus.

On review, the Supreme Court "assimilate[d] petitioner's status to that of an alien continuously resident and physically present in the United States" for purposes of determining his constitutional right to due process. *Chew*, 344 U.S. at 596, 73 S.Ct. at 477. The Court's decision to so characterize Chew's status requires careful examination in order to determine whether Rafeedie should be similarly assimilated.

The Court noted that Chew had been on board an American vessel, with its home port in the United States, and, upon completion of the voyage, has returned to the United States still on board. The Court concluded that Chew, "who with full security clearance and documentation pursued his vocation for four months aboard an American ship," *Mezei*, 345 U.S. at 214, 73 S.Ct. at 630, "from a constitutional point of view, [is] a person entitled to procedural due process under the Fifth Amendment." The Court further noted that its theoretical "assimilation" of Chew to the status of continuously residing permanent resident accorded with the purposes of the Nationality Act of 1940, which provided that continuous service by a seaman on an American vessel whose home port is in the United States constituted continual residence for naturalization purposes. *Chew*, 344 U.S. at 601, 73 S.Ct. at 479–80. Thus, "to escape constitutional conflict," the Court held that the regulations authorizing exclusion without hearing were not applicable to Chew. *Mezei*, 345 U.S. at 214, 73 S.Ct. at 630.[37]

---

**36.** Chew's exclusion was based on 8 C.F.R. § 175.57(b), the predecessor regulation to Section 235(c), added to the Nationality Act of 1952, Pub.L. No. 82–414, Ch. 4, § 235, 66 Stat. 163, 198 (1952), one year before *Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), was decided. The two provisions are quite similar substantively.

8 C.F.R. § 175.57 provided that an alien may be temporarily excluded if it appeared that he may be excludable under § 175.53.

The categories for exclusion set forth in § 175.53 were those defined "to be prejudicial to the public interest," including membership in an organization opposed to the United States or engaged in rebellion, insurrection, or violent uprising against the United States. *Chew*, 344 U.S. at 591 n. 1, 73 S.Ct. at 474–75 n. 1.

If the alien were found to be temporarily excludable under these categories, then the Attorney General could deny a hearing and an appeal "if the Attorney General determine[d]

that he is excludable under one of the categories set forth in § 175.53 on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest."

The regulation did not provide for notice to the alien of the charges or opportunity to submit information as does the current Section 235(c). The differences between the regulation at issue in *Chew* and *Mezei* and Section 235(c) are not relevant to this threshold issue, but may be important later in determining the contours of the process Rafeedie should be accorded.

**37.** As the Supreme Court later pointed out in *Landon v. Plasencia*, 459 U.S. 21, 33, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982), although "the holding [in *Chew*] was one of regulatory interpretation, the rational was one of constitutional law." This constitutional holding was confirmed in *Rosenberg v. Fleuti*, 374 U.S. 449, 460, 83 S.Ct. 1804, 1811, 10 L.Ed.2d 1000 (1963), where *Chew* was described as holding that a returning resident alien "is entitled as a matter

*Chew* thus stands for the proposition that *"under some circumstances* temporary absence from our shores cannot constitutionally deprive a returning lawfully resident alien of his right to be heard." *Mezei,* 345 U.S. at 213, 73 S.Ct. at 630 (emphasis added). This holding, that the circumstances of departure are critical to the determination of an alien's due process rights, was confirmed by the Supreme Court's opinion one month later in *Mezei.* In *Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956, the Supreme Court held that an alien who had taken a 19–month trip abroad, behind the "Iron Curtain," should not be assimilated to the status of a continuously present resident alien and could be summarily excluded on security grounds. As with *Chew,* the facts of *Mezei* are critical to understanding how the Court's holding would apply to Rafeedie's circumstances.

Born in Gibraltar, Mezei lived in the United States with his wife in Buffalo, New York from 1923 to 1948. *Id.* at 208, 73 S.Ct. at 627. In 1948, he sailed to Europe, "apparently without authorization or reentry papers," *id.* at 214, 73 S.Ct. at 630, allegedly to visit his dying mother in Rumania. Denied entry there, he remained in Hungary for some 19 months, due to difficulty in securing an exit permit. He eventually proceeded to France and boarded a ship for New York. Upon arrival in New York in 1950, he was temporarily excluded by an immigration inspector. The Attorney General then ordered his permanent exclusion without a hearing based on "information of a confidential nature, the disclosure of which would be prejudicial to the public interest." *Id.* at 208, 73 S.Ct. at 627.[38] While temporarily excluded and detained on Ellis Island, Mezei searched for another country to accept him, but was unsuccessful.

In concluding that the summary procedure was constitutional as applied to Mezei, the Supreme Court focused on the alien's history, the reasons for his departure, and the section of the Nationality Act that "deems protracted absence such as respondent's a clear break in an alien's continuous residence here." *Id.* at 214, 73 S.Ct. at 630. Thus, while reaffirming that "a resident alien may not captiously be deprived of his constitutional rights to procedural due process," *id.* at 213, 73 S.Ct. at 630, and "under some circumstances temporary absence from our shores cannot constitutionally deprive a returning lawful resident alien of his right to be heard," *id.* (citing *Chew* ), the Court found that Mezei was an *entrant* alien or "assimilated to [that] status" for constitutional purposes. *Id.* Accordingly, Mezei was not entitled to a hearing, nor could the Attorney General be compelled to disclose the evidence on which the exclusion was based. *Id.* at 215, 73 S.Ct. at 630.[39]

It is no simple task to determine to which status Rafeedie should be "assimilated" for purposes of his due process claim. In *Chew* and *Mezei,* the Supreme Court reviewed several factors in reaching opposite conclusions about the rights of the re-entering aliens in those cases, but set forth no precise criteria or test for making such a determination. More recently, in *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), the Supreme Court addressed this very same factual issue, but in the context of immigration "entry" decisions. Plaintiff argues that the *Plasencia* analysis is not transferrable to the due process context and that the only concern of the Supreme Court clearly set forth in *Chew* and *Mezei* was whether the alien's trip was "brief." Scrutiny of the Court's reasoning and discussion in *Chew, Mezei,* and *Plasencia,* however, leads this Court to the conclusion that the test is not

---

of due process to a hearing on the charges underlying any attempt to exclude him."

**38.** The basis for the exclusion in *Mezei* was, as in *Chew,* the regulatory predecessor to Section 235(c)—8 C.F.R. § 175. *See supra* note 36.

**39.** Notably, during the district court's consideration of Mezei's petition for writ for habeas corpus, when the government declined to divulge the confidential information, even *in camera,* the district court directed that Mezei be conditionally released. *Mezei,* 345 U.S. at 209, 73 S.Ct. at 627.

as simplistic as plaintiff would have it and that the *Fleuti* test should be applied.

In *Plasencia,* the permanent resident alien was a citizen of El Salvador. After initially entering the United States in 1970, she established a home in Los Angeles with her husband, a United States citizen, and their minor children. On June 27, 1975, she and her husband traveled to Tijuana, Mexico. While there, according to the INS, she made arrangements to assist the illegal entry of several Mexican and Salvadoran nationals into the United States. When Plasencia and her husband attempted to cross the border two days later with six illegal aliens in their car, she was detained and charged with assisting the unlawful entry of aliens. 459 U.S. at 23, 103 S.Ct. at 324. At an exclusion hearing held by an immigration judge approximately 1½ hours after her detention, she was ordered excluded. Plasencia sought a writ of habeas corpus, arguing that because she was a lawful permanent resident alien, she was entitled to a deportation rather than an exclusion hearing.[40] The government contended that since she was "entering," [41] she was only entitled to an exclusion hearing.

The Supreme Court held that *"under the circumstances of this case,* [Plasencia] can invoke the due process clause on returning to this country, although we do not decide the contours of the process that is due or whether the process accorded Plasencia was insufficient." *Id.* at 32, 103 S.Ct. at 329 (emphasis added).[42] In explaining its conclusion that plaintiff was entitled to due

process, the Court observed, citing *Chew,* that it had "developed the rule that a *continuously present* permanent resident alien has a right to due process" when threatened with deportation. *Id.* at 33, 103 S.Ct. at 329 (emphasis added). The Court explained that

> if the permanent resident alien's absence is extended, of course, he may lose his entitlement to "assimilat[ion of his] status," [*Chew* ], to that of an alien continuously residing and physically present in the United States. In *[Mezei],* this Court rejected the argument of an alien who had left the country for some 20 months that he was entitled to due process in assessing his right to admission on his return. We did not suggest that no returning resident alien has a right to due process, for we explicitly reaffirmed *Chew.* We need not decide now the scope of *Mezei;* it does not govern this case, for Plasencia was absent from the country only a few days, and the United States has conceded that she has a right to due process....

*Id.* at 33–34, 103 S.Ct. at 329–30 (citations partially omitted). The *Plasencia* Court thus did not analyze the constitutional dimensions of the issue because it was unnecessary; the Court did, however, elaborate on what constitutes an interruption of permanent residence status for the purposes of statutory definition of "entry." 8 U.S.C. § 1226(a). Expressly reaffirming *Rosenburg v. Fleuti,* 374 U.S. 449, 83 S.Ct.

---

**40.** A deportation hearing would have afforded Plasencia substantially greater procedural protections. For one, in deportation proceedings, the INS must give the alien seven days' notice of the charges against her. *Landon v. Plasencia,* 459 U.S. 21, 25–26, 103 S.Ct. 321, 325, 74 L.Ed. 2d 21 (1982). No advance notice is required for an alien subject to exclusion proceedings. Further, after an adverse deportation decision, an alien may appeal directly to a court of appeals, while after an adverse exclusion proceeding the request for relief must be brought through a habeas corpus petition. *See supra* note 21 and accompanying text. Further, an alien who loses her right to reside in the United States after a deportation hearing "has a number of substantive rights not applicable to the alien who is denied admission in exclusion proceedings"; for example, she can choose the country of deporta-

tion, depart voluntarily, or seek suspension of deportation. *Plasencia,* 459 U.S. at 25–26, 103 S.Ct. at 325.

**41.** 8 U.S.C. § 1101(a)(13) provides that "an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him."

**42.** Over the strong dissent of Justice Marshall, the Supreme Court remanded the case for a determination of whether Plasencia had been accorded due process under all of the circumstances. 459 U.S. at 38, 103 S.Ct. at 332.

1804, 10 L.Ed.2d 1000 (1963), the Court concluded that no entry occurred where the alien's departure "was not intended or reasonably to be expected by him, i.e., where an alien did not intend to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." *Plasencia*, 459 U.S. at 29, 103 S.Ct. at 327.

The factors examined by the Court in making this determination included the length of the absence, the purposes of the visit, and whether the alien had to procure any travel documents in order to make his trip. As the Court remarked,

> an 'innocent, casual, and brief excursion' by a resident alien outside this country's borders would not subject him to the consequences of an 'entry' on his return. If, however, the 'purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws, it would appear that the interruption of residence thereby occurring would properly be regarded as meaningful.' That distinction both protects resident aliens from 'unsuspected risks and unintended consequences of ... a wholly innocent action' ... and gives effect to the language of § 101(a)(13).

*Id.* at 29, 103 S.Ct. at 327 (citations omitted).[43]

■ Accordingly, the question here is whether the *Fleuti* standard is a restatement of the factors set forth in *Chew* and *Mezei* or whether this standard cannot be transferred from the statutory to the constitutional context. For several reasons, this Court agrees with defendants that the *Fleuti* test is applicable to the constitutional arguments raised in this case. As discussed above, the Supreme Court's determinations in both *Chew* and *Mezei* clearly turned on the circumstances of the aliens' trips abroad. And, in *Chew* in particular, the Court looked to other provisions of the immigration laws (*i.e.*, the provision regarding seamen) for help in determining Chew's constitutional status. Additionally, the *Fleuti* court found that Congress well recognized the "momentous" interests at stake in defining "entry."[44] The Court then noted that *Chew*, although not directly helpful in defining "brief" absence, supported a liberal interpretation of the intent exception.[45] *Id.* at 460, 83 S.Ct. at 1811. Further, the rationale behind the *Fleuti* test is consistent with the concerns expressed by the Court in both *Chew* and *Mezei*. Under *Fleuti*, the court looks not only at the duration of the trip but also at its purpose. Though application of this test to Rafeedie may well make his case more difficult, it surely provides greater protection generally to aliens seeking to re-enter the United States from abroad. Were duration the only factor to be considered, an extended, but wholly innocent, trip abroad would more readily divest an alien of constitutional rights than a brief, but nefarious excursion. Reliance on duration alone, rather than in addition to purpose and intent, would also be inimical to

---

**43.** In *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), a permanent resident alien, a Swiss national, who had resided in the United States for four continuous years made an afternoon visit "for a couple hours'" duration to Mexico. Upon his return across the border, the INS sought to exclude him on the grounds that he was "afflicted with a psychopathic personality" because he was a homosexual. The question of "entry" was critical to Fleuti because he could not have been denied entry into the United States on this same basis at the time of his initial entry in 1952. Because the lower courts had not developed the record with any detailed description or characterization of Fleuti's trip to Mexico, the Court remanded the case for a determination of whether his trip had been "brief, innocent, and casual." *Id.* at 463, 83 S.Ct. at 1812.

**44.** *See also Catholic Social Services, Inc. v. Meese*, 685 F.Supp. 1149 (E.D.Cal.1988), holding invalid INS's regulations promulgated under Section 245A of the Immigration and Nationality Act that restrictively interpreted "brief, casual, and innocent," and discussing legislative recognition and historical development of that test since *Fleuti*.

**45.** The Court also emphasized that *Chew* "did *not* create a right to identical treatment for these two differently situated groups of aliens," *i.e.*, it did not require that Chew, even though assimilated to the status of a permanent resident alien for due process purposes, was entitled to a deportation rather than an exclusion hearing. *Id.* at n. 7.

the national security interests necessarily implicated by the summary exclusion proceedings under Section 235(c). This Court holds therefore that the "innocent, brief, and casual" test articulated by the Supreme Court in *Fleuti* applies in determining whether a re-entering alien should be assimilated to the constitutional status of a continuously residing permanent resident alien for due process purposes.

■ This conclusion does not end the inquiry, however, as the Court cannot determine without further factual development whether plaintiff's trip to Syria was "brief, innocent, and casual." According to the INS's version of events, plaintiff intentionally lied to the INS about the purpose of his trip in obtaining his reentry permit, traveled to Syria for two weeks to attend the conference of the Palestinian Youth Organization (which is characterized as a terrorist organization and is allegedly affiliated with the PFLP, of which, the INS contends, Rafeedie is a knowing and meaningful member), and then again lied to immigration officers about his trip upon his reentry into the United States. If these allegations prove true, Rafeedie's trip could well be far from "casual, brief, and innocent." [46] At this preliminary stage of this litigation, plaintiff has not directly denied the bulk of the INS's allegations regarding the circumstances of his trip. He does, however, deny one critical aspect of this characterization—that he has ever been a member of the PLO, the PFLP, or a terrorist organization. If he is correct, then even if it is true that he had not been truthful with the INS about the purpose of his trip, his trip might still be characterized as casual, brief, and innocent. Only if plaintiff prevails on this fact-bound issue can the merits of his due process claim be determined. Accordingly, while the Court cannot reach a meaningful conclusion at this point as to plaintiff's likelihood of success

even on this preliminary due process issue, summary judgment must be denied because there are genuinely disputed issues of material fact as to the nature of Rafeedie's trip abroad, issues that play a pivotal role in the constitutional analysis.

Although these factual issues must first be addressed before plaintiff's entitlement to due process can be resolved, should plaintiff be assimilated to the status of a permanent resident alien for constitutional purposes, the Court notes that plaintiff has raised serious due process concerns about the summary exclusion proceedings. The constitutional sufficiency of procedures for due process purposes, of course, varies with the circumstances. *Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330. "In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures." *Id.* But, "[w]hile the type of hearing required by due process depends upon a balancing of the competing interests at stake, due process requires 'at a minimum ... that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing.'" *Plasencia,* 459 U.S. at 38, 103 S.Ct. at 332 (Marshall, J., concurring and dissenting).

Section 235(c) provides an alien only one opportunity to submit information and argument on his own behalf, and even that option must be exercised in ignorance of the nature of the confidential information with which he has been charged. Further, plaintiff is not entitled to any direct confrontation with the evidence or with the INS during the summary procedure.[47] The

---

**46.** The INS's decision to "parole" Rafeedie to his home in Ohio and defer inspection, 8 C.F.R. § 235.3(c), 8 U.S.C. § 1182(d)(5)(A), does not alter his status for purposes of this constitutional analysis. Plaintiff must still be treated as if he were stopped at the border. *Mezei,* 345 U.S. at 215, 73 S.Ct. at 630 (temporary arrangements do not affect an alien's constitutional status);

*Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir. 1984), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

**47.** Plaintiff also suggests that he is denied due process under the summary procedures because the Regional Commissioner is part of the enforcement arm of the INS and is far from an

most plaintiff knows is the specific statutory provisions the INS contends plaintiff has violated.[48] Without any opportunity for confrontation, there appears to be no check on the quality of the confidential information upon which the INS relies in determining whether to exclude the alien. As Justice Black explained in *Jay v. Boyd*, 351 U.S. 345, 365, 76 S.Ct. 919, 931, 100 L.Ed. 1242 (1956) (dissenting):

> What is meant by "confidential information"? According to officers of the Immigration Service it may be "merely information we received off the street"; or "what might be termed as hearsay evidence, which could not be gotten into the record * * * "; or "information from persons who were in a position to give us the information that might be detrimental to the interests of the Service to disclose that person's name * * *"; or "such things, perhaps, as income-tax returns, or maybe a witness who didn't want to be disclosed, or where it might endanger their life, or something of that kind * * *."[49]

Thus, in reality, the procedures under Section 235(c) may well "virtually assure[ ] that the Government attorney would

present his case without factual or legal opposition." *Plasencia,* 459 U.S. at 41, 103 S.Ct. at 334 (Marshall, J. dissenting). "When a permanent resident alien's substantial interest in remaining in this country is at stake, the Due Process Clause forbids the Government to stack the deck in this fashion. Only a compelling need for truly summary action could justify this one-sided proceeding." *Id.*[50]

The Court is nonetheless well-aware that should plaintiff be entitled to a hearing before an immigration judge, he might still never be apprised of the specific confidential information on the basis of which defendants contend Rafeedie is excludable; he may neither be able to confront his accusers nor cross-examine informers because the confidential information might still require *in camera* scrutiny. *Suciu v. INS,* 755 F.2d 127, 129 (8th Cir.1985). A court must seriously consider the national security implications of releasing any of the confidential information to the plaintiff for confrontation purposes. *See Department of the Navy v. Egan,* —— U.S. ——, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988). For example, in *Mezei,*[51] and notably in the

---

independent or quasi-independent tribunal. 8 C.F.R. § 100.2(d) describes the function of the Regional Commissioner as responsible for "administration and enforcement" subject to the general supervision of the Commissioner and Deputy Commissioner. In contrast, an exclusion hearing would be conducted before an immigration law judge, who occupies a position independent of the INS.

**48.** The statute does not require the INS to provide plaintiff a description of the confidential information. In this case, such a brief description was provided only in the INS's briefs after the commencement of this litigation.

**49.** Justice Black also observed: "There is no possible way to contest the truthfulness of anonymous accusations. the supposed accuser can neither be identified nor interrogated. He may be the most worthless and irresponsible character in the community. What he said may be wholly malicious, untrue, unreliable, or inaccurately reported." *Jay v. Boyd,* 351 U.S. 345, 365, 76 S.Ct. 919, 931, 100 L.Ed. 1242 (1956) (Black, J., dissenting). In a separate dissent, Justice Douglas concurred in these sentiments: "a hearing is not a hearing in the American sense if faceless informers of confidential information

may be used to deprive a man of his liberty." *Id.* at 376, 76 S.Ct. at 936.

**50.** The Supreme Court has indicated, however, that the practice of not disclosing confidential information to aliens does not violate due process. *Jay,* 351 U.S. at 357 n. 21, 76 S.Ct. 923 at 927 n. 21. In *Jay,* an alien citizen of Great Britain who had lived in the United States for 29 years was ordered deported on the basis of his membership for five years in the Communist Party. His application for discretionary suspension of deportation had been denied by the Attorney General on the basis of confidential undisclosed information even though the special inquiry officer had found petitioner qualified in terms of the statutory prerequisites for favorable exercise of discretionary relief.

Petitioner challenged the denial as unlawful because it was based on confidential information. The Supreme Court held that, given the "gratuitous" nature of the relief, petitioner had no right to full disclosure of the confidential information. *Id.* at 359, 76 S.Ct. at 927. *See also Suciu v. INS,* 755 F.2d 127, 128 (8th Cir. 1985) (Rumanian in United States on student visa deported on basis of confidential information with national security implications).

**51.** *See supra* note 39.

Shihadeh proceeding, the alien was not allowed to confront the confidential information on which the INS, at least in part, based its charges of excludability. Indeed, plaintiff has not specifically challenged in this case the INS's right to have such information accorded *in camera* treatment because of national security concerns. Thus, the substantive result of an ordinary exclusion proceeding may well be the same as that of a summary exclusion proceeding— Rafeedie could be excluded on the basis of information or an accuser that he neither sees nor confronts. However, Rafeedie would at least have had a hearing before an immigration judge, with all the attendant process accorded a continuously residing alien.[52] The constitutional purpose of due process, of course, is *process,* not result. "Procedural fairness and regularity are of the indispensable essence of liberty. Severe substantive laws can be endured if they are fairly and impartially applied." *Mezei,* 345 U.S. at 224, 73 S.Ct. at 634 (Jackson, J., dissenting). Leaving these important issues as a framework for future analysis in this case, the Court turns to the merits of plaintiff's second statutory challenge.

*3. Count III: Does Application of Section 235(c) to Plaintiff Violate Section 901 of the Foreign Relations Authorization Act?*

Plaintiff alleges in Count III that defendants' initiation of exclusion proceedings on the basis of Section 212(a)(27) and (a)(28)(F) violates the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989, Pub. L. 100–204, 101 Stat. 1339 (Dec. 22, 1987). Section 901 provides:

> Notwithstanding any other provision of law, no alien may be denied a visa or excluded from admission into the United States, subject to restrictions or conditions on entry into the United States, or subject to deportation because of any past, current, or expected beliefs, statements, or associations which, if engaged

in by a United States citizen in the United States, would be protected under the Constitution of the United States.

Congress carved out various exceptions to this rule, two of which defendants contend apply to plaintiff. First, Section 901 does not protect aliens "who a consular official or the Attorney General knows or has reasonable ground to believe has engaged, in an individual capacity or as a member of an organization, in a terrorist activity or is likely to engage after entry in a terrorist activity." § 901(b)(2). "Terrorist activity" is further defined as:

> the organizing, abetting, or participating in a wanton or indiscriminate act of violence with extreme indifference to the risk of causing death or serious bodily harm to individuals not taking part in armed hostilities.

Second, Section 901 does not apply to an alien who is "described in section 21(c) of the State Department Basic Authorities Act of 1956." That legislation, in turn, refers to an alien "who is a member, officer, representative, or spokesman of the Palestine Liberation Organization." 22 U.S.C. § 2691(c).

Before examining these two exceptions, it should be determined first whether Rafeedie falls within the broad protective provisions of Section 901, *i.e.,* whether the activities that defendants allege require his exclusion would be tolerated if engaged in by a United States citizen. Defendants contend that plaintiff attended a conference of the Palestine Youth Organization, which is affiliated with the PFLP, that plaintiff is a high-ranking member of the PFLP, and that plaintiff has undertaken fundraising and recruiting activities for the PFLP in the United States. Defendants have not asserted that the PYO itself has any unlawful aims or activities; that the PFLP does not have non-terrorist aims or activities (despite that it is considered a "terrorist" organization)[53]; or that plaintiff has directly engaged in any terrorist

---

**52.** Another aspect of due process to be considered is the allocation of the burden of proof. For example, in *Plasencia,* the Supreme Court pointed out that the Board of Immigration Appeals follows the practice of placing the burden

of proof on the government when the alien in an exclusion proceeding is a permanent resident alien. 459 U.S. at 35, 103 S.Ct. at 330.

**53.** 133 Cong.Rec. H–11332 (Dec. 14, 1987).

activity himself. Defendants' case against Rafeedie appears to rest solely on his alleged membership in the PFLP and his supporting activities such as fundraising and recruiting. Plaintiff denies that he has in any way been a member of or involved with the PLO, the PFLP, or any terrorist organization, although he has not denied that he is a member of the PYO.

Were Rafeedie an American citizen, would such alleged membership and activity be protected? It is clear that mere association with an organization that' advocates violence or terrorism, without proof that the individual's " 'association poses the threat feared by the Government,' is an impermissible basis upon which to deny First Amendment rights." *Healy v. James,* 408 U.S. 169, 186, 92 S.Ct. 2338, 2348, 33 L.Ed.2d 266 (1972). There is a critical constitutional distinction between "mere advocacy and advocacy 'directed to inciting or producing imminent lawless action and ... likely to incite or produce such action.' " *Id.* at 188, 92 S.Ct. at 2350 (citing *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969)). "The government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a *specific intent to further those illegal aims." Id.* (emphasis added).

Here, of course, defendants allege more than mere membership, they allege that Rafeedie has actually undertaken fundraising and recruiting activities for the PFLP, at least in the United States. Accepting these allegations as true for the moment, he may have crossed the first amendment line drawn in Section 901 between passive membership or advocacy to active further-ance of the aims and goals of a terrorist organization. That such activity would not be protected is supported by the legislative history of Section 901.

The purpose of the amendment was to deny the executive branch the power to deny admission to aliens "on the basis of their expression of beliefs, their advocacy of political positions, or their association in political organizations which would be constitutionally protected if engaged in by U.S. citizens within the United States." 133 Cong.Rec. 11343 (Dec. 14, 1987).[54] As discussed further below, were the allegations against Rafeedie based solely on his membership or advocacy, he would most likely be protected. However, Congress has suggested that fundraising and recruiting activities were not to similarly be viewed as benign.

■ As to the first "terrorist activity" exception, defendants contend that plaintiff is not entitled to the protections of Section 901 because it excludes PLO members, and impliedly, affiliated organizations such as the PFLP.[55] Defendants concede, as they must, that the plain language of 22 U.S.C. § 2691(c) refers only to members of the PLO and not to its affiliates. Under defendants' theory, the PLO exception should be read broadly to encompass all members of groups affiliated with the PLO, including the PFLP. The only support for defendants' expansive interpretation is that elsewhere in amending the Foreign Relations Authorization Act, Congress expressly included "constituent groups" and "allies and affiliates" of the PLO. 22 U.S.C. §§ 5201(a)(4), 5201(a)(7), 5202.[56] However, where Congress "includes particular lan-

---

**54.** In particular, Congress was deeply concerned that over the past 35 years, "a large number of well-known foreign politicians, authors, academicians, journalists, and artists, as well as thousands of ordinary citizens from foreign countries have been barred from entering this country, forced to undergo the indignity of answering embarrassing questions about their political or personal activities or ... required to submit to a lengthy bureaucratic process in order to obtain a waiver to enter the United States." 133 Cong. Rec. 11343 (Dec. 14, 1987).

**55.** Defendants have not alleged that plaintiff is a member of the PLO. Plaintiff has specifically denied that he is. Rafeedie Decl. ¶ 15.

**56.** Section 1002 comprises the "determinations" preamble to the Anti–Terrorism Act of 1987, which prohibits the receipt of anything of value "except information material" from the PLO "or any of its constituent groups," the expenditure of funds from the PLO "or any of its constituent groups," or the maintenance of any office or facilities in the United States for the PLO "or any of its constituent groups." 22 U.S.C. § 5202.

guage in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally or purposefully in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)). There is no illuminating discussion in the legislative history of Section 901 or the PLO exception. *See* S.Rep. No. 96–116, at 15; H.Conf.Rep. No. 96–399, at 18. Absent indications of congressional intent to the contrary, the Court must, and does, conclude that the term "PLO" alone in Section 901 does not include the PFLP. This accords with the settled rule that deportation statutes must be construed in favor of the alien. *Lennon v. INS,* 527 F.2d 187, 193 (2d Cir.1987). Thus, the PLO exception does not apply to Rafeedie.

■ The application of the second exception poses more difficulty. This exception applies to an alien who "has engaged" or "is likely to engage" in a terrorist activity. This is a conduct—not a status-based provision. *See Abourezk v. Reagan,* 785 F.2d 1043, 1054 (D.C.Cir.1986), *aff'd mem.,* — U.S. ——, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987); *see also Allende v. Shultz,* 845 F.2d 1111 (2d Cir.1988). Defendants do not allege in this case that plaintiff has directly engaged or is likely to directly engage in any terrorist activity, but they contend that his activities such as fundraising and recruiting for the PFLP constitute "abetting" or furtherance of such activities and therefore bring him within this provision.

The Conference Report accompanying Section 901 does suggest such a broad interpretation; it states that Congress considers that "organizing, abetting, or participating in terrorist acts or activities would include not only actually pulling a trigger or planting a bomb, but providing support or assistance, such as but not limited to: planning, providing facilities, *recruiting, financing* or *fundraising,* surveillance, courier service, transportation, providing weapons, or forging or unlawfully procuring documents." 133 Cong.Rec. 11344

(Dec. 14, 1987) (emphasis added). Despite this amplification, plaintiff argues these references to fundraising and recruiting must be read in the "activity specific" context, *i.e.,* that the purpose of the fundraising and recruiting must be to facilitate terrorist *activities,* not just generally to further the purposes of a terrorist *organization.* A genuine issue of material fact is thus presented regarding the nature of Rafeedie's alleged fundraising and recruiting activities.

Defendants have not yet revealed to this Court the exact nature of what they allege to be plaintiff's fundraising and recruiting activities for the PFLP in the United States. While defendants have not argued that *all* of the activities of the PFLP are terrorist activities, plaintiff has similarly not contended that, if Rafeedie did undertake fundraising and recruiting, it was for "innocent" purposes. Conceivably, under some circumstances, plaintiff's fundraising and recruiting might be characterized as passive, innocent, or in furtherance of advocacy or speech. On the other hand, the money may well have been raised directly for the PFLP's "war chest" to finance its activities, including terrorist activities. Since defendants' description of its alleged proof against plaintiff at this point is inadequate, it is impossible to determine whether his alleged activities did in fact directly aid the PFLP in carrying out terrorist activities or whether they were clearly for non-terrorist purposes. *See Healy,* 408 U.S. at 186, 92 S.Ct. at 2348. Resolution of this issue may depend on who bears the burden of proof. On the one hand, to require the government to show that plaintiff's fundraising and recruiting went directly to support a terrorist activity, rather than other goals of the PFLP, might be an impossible burden. And, arguably, it is the plaintiff's task to prove that he is entitled to the protection of Section 901. On the other hand, it may also be a difficult burden for plaintiff to show that any fundraising or recruiting done was for "innocent" purposes; perhaps, however, an alien assumes this risk of proof when he becomes involved with a terrorist organization and does not clearly delimit his activities on its

behalf. In any event, because the record is wholly inadequate on this issue, summary judgment is inappropriate. The interests at stake are important. Both parties should have an opportunity to present their evidence on this issue to the Court, if necessary, through *in camera* procedures.[57]

### 4. Plaintiff's Remaining Claims

A full discussion of plaintiff's remaining three claims is unnecessary here for several reasons. First, plaintiff has requested summary judgment only on Counts I–IV.[58] As discussed above, a genuine issue of material fact is disputed with regard to whether the INS is in fact basing its exclusion charges on non-protected activity, and therefore, summary judgment cannot therefore be granted on Count IV, which challenges Sections 212(a)(27) and (a)(28)(F) under the First Amendment.[59] In order that plaintiff's remaining constitutional claims may be properly addressed at the appropriate time, deliberate and careful development of the record is necessary. The Court therefore turns to the remaining factors considered in determining whether preliminary relief should be granted.

### B. Irreparable Harm

█ As discussed earlier with respect to defendants' motion to dismiss for lack of exhaustion, plaintiff has persuasively argued that he will be irreparably injured should he be required to go through the Section 235(c) proceeding. Plaintiff would immediately lose his right to work and be subject to detention. These interests are weighty, *Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982), and alone weigh heavily in favor of preliminary relief. Plaintiff has lived in the United States for thirteen years, has developed family, educational, and employment ties in his community. The impact of detention pending review would indeed be grave. In view of the high likelihood of injury, preliminary injunctive relief is warranted. *See Population Institute*, 797 F.2d at 1078.[60]

### C. Public Interest and Impact on Third Parties

Rafeedie has been a free man ever since he was temporarily denied re-entry two years ago, in April 1986. By releasing him on parole from his temporary exclusion, the INS has already made a determination that such release was in the public interest and does not pose a threat to national security. Defendants do not allege that plaintiff has undertaken activities since then that endanger the public interest. Any public interest in continuation of the summary exclusion proceeding, as discussed above with respect to defendants' exhaustion arguments, or adverse impact on third parties from enjoining such proceedings, is minimal and outweighed by Rafeedie's liberty interests.

### IV. Conclusion

Accordingly, for the reasons set forth above, it is hereby

---

**57.** Defendants' final argument that Section 901 should not be applied because it is only "temporary" legislation that does not supersede the Nationality and Immigration Act is meritless. Congress inserted a one-year "sunset" provision because it stated its intention to make more comprehensive amendments in the near future, 133 Cong. Rec. 11344 (Dec. 14, 1987), but until expiration, Section 901 is the law. Section 901 also applies to Rafeedie because his case involves an admission sought after December 31, 1987 and before March 1, 1989. And, contrary to defendants' contention, the provisions expressly apply "notwithstanding any other provision of law," and thus control in the event of conflict with the Immigration and Nationality Act.

**58.** The parties agree that disputed fact issues exist as to Counts V and IV, on which plaintiff has not requested summary judgment.

**59.** The Second Circuit Court of Appeals has recently held in the context of a visa denial that Section 212(a)(27) requires a reasonable belief that the alien will engage in harmful activities. *Allende v. Shultz*, 845 F.2d 1111 (2d Cir.1988).

**60.** As discussed above, the Court places little weight on plaintiff's argument that continuation of the Section 235(c) proceeding would chill his first amendment rights by discouraging him from speaking out on Palestinian rights issues or that his right to defend himself would be impaired because he will have to reveal his entire defense without any revelation on the part of the INS or will be discouraged from putting on any defense. Though the potential for such effects may be significant, plaintiff has not demonstrated how the risk would be greater than that occurring in an ordinary exclusion proceeding.

ORDERED that defendants' motion to dismiss is denied; plaintiff's motion for preliminary injunction is granted; and plaintiff's motion for partial summary judgment is denied; and it is

FURTHER ORDERED that there shall be a status call on July 7, 1988 at 9:30 a.m. to determine further proceedings in this case.

IT IS SO ORDERED.

## PRELIMINARY INJUNCTION

Upon consideration of plaintiff's motion for a preliminary injunction, defendants' opposition thereto, and in accordance with the accompanying Memorandum Opinion, it is accordingly hereby

ORDERED that defendants, and their officers, employees, agents, servants, and attorneys, be and they hereby are preliminarily enjoined from continuing to conduct exclusion proceedings against plaintiff under Section 235(c) of the Immigration and Nationality Act, 8 U.S.C. § 1225(c), or from conducting any exclusion proceeding against plaintiff on the basis of charges brought under 8 U.S.C. § 1182(a)(27) and (a)(28)(F), and from entering any order of exclusion or deportation against plaintiff on the basis of proceedings conducted under these sections; and it is

FURTHER ORDERED that this preliminary injunction shall continue in full force and effect until the conclusion of this litigation or until earlier order of the Court.

IT IS SO ORDERED.