FULL GOSPEL PORTLAND CHURCH
and Hae Sook Kim, Plaintiffs,

v.

Richard THORNBURGH,[1] et
al., Defendants.

Civ. A. No. 88–0521.

United States District Court,
District of Columbia.

Oct. 17, 1988.

On Application for Attorney Fees
Oct. 4, 1989.

---

**1.** Substituted for Edwin Meese, pursuant to Fed.
R.Civ.P. 25(d).

Susan Au Allen, Washington, D.C., for plaintiffs.

Deborah A. Robinson, then an Asst. U.S. Atty., A. Patricia Frohman, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This immigration case comes before the Court on defendants' motion to dismiss (treated as a motion for summary judgment) and plaintiffs' cross-motion for summary judgment.

Until the defendants revoked plaintiff Hae Sook Kim's (Ms. Kim's) visa petition in September, 1986, she was the accompanist, choir director and piano teacher at co-plaintiff Full Gospel Portland Church in Portland, Oregon, earning $900 per month for a 40–hour or more work week. She had a Third Preference visa under 8 U.S.C. § 1153(a)(3), which provides that:

Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a) of this title, to qualified immigrants who are members of the professions, or who because of their exceptional ability in the sciences or the arts will substantially benefit prospectively the national economy, cultural interests, or welfare of the United States, and whose services in the professions, sciences or arts are sought by an employer in the United States.

Pub.L. 96–212, Title II, § 203(c)(3), 94 Stat. 107, 108 (1980).

The Full Gospel Portland Church serves the Korean–American community in the surrounding community. Like many other churches in this country, it provides programs to meet the needs of its members. Since Koreans have a long musical tradition, one of the needs of its members was piano lessons. Due to the revocation, the church has no piano teacher; Ms. Kim cannot receive any pay for her work as an accompanist, and she is in danger of being deported.

The dispute before the Court involves the legality of the revocation of the plaintiff's visa petition. The District Director of the Immigration and Naturalization Service (INS) revoked the petition on the ground that Ms. Kim was not a professional within the meaning of 8 U.S.C. § 1101(a)(32), which provides that:

The term "profession" shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries.

Plaintiffs contend that the revocation was arbitrary and capricious in the light of numerous affidavits testifying to the cultural

contribution Ms. Kim was making to her church and the Korean–American community in Portland as a professional musician and music teacher.

## I. *Facts.*

These and other relevant material facts are not in dispute.

### A. *Ms. Kim's status before revocation.*

In 1984, the Church filed an application with the Department of Labor seeking certification that there were no qualified United States workers ready, willing and able to fill the position offered to and subsequently held by Ms. Kim. It was issued a certification in 1985, and shortly thereafter, Full Gospel petitioned Defendants for a Third Preference visa petition. Defendants, through the Northern Regional Service Center, approved the petition in July of 1985. That October, Ms. Kim and her family filed with the defendants their applications to adjust their status to permanent residents. She was granted permission to work, and in January, 1986, she began employment with the Church according to the terms of her job offer, $900 per month, and Full Gospel paid her Social Security taxes.

### B. *The revocation.*

In March, 1986, notice was sent to Ms. Kim that the Service intended to revoke her Third Preference visa petition. She responded to that notice, but in September, 1986, defendants revoked her petition, alleging the following:

1. Ms. Kim is not a certified teacher, nor a professional. Her music school (the Church) is unaccredited.

2. Though her labor certification had called for someone who could teach beginning, intermediate and advanced students, Ms. Kim presented no evidence that she was in fact teaching intermediate or advanced students.

3. The Church's music school did not need a person holding a college degree to teach piano and music.

4. The salary offered to Ms. Kim was not within the general range into which professionals' salaries fall.

5. The Church congregation is too small to have made a bona fide job offer.

6. Students might discontinue their lessons after only a few months, which also indicates that Full Gospel did not make a bona fide job offer.

### C. *The Appeal.*

The Church filed an appeal of the revocation with the Administrative Appeals Unit (AAU) in Washington, D.C. The AAU upheld the revocation and dismissed the appeal, although it found that Ms. Kim is a credentialed music graduate; that a department chairman from the University of Oregon had found that the Church's program would require a degreed person if Full Gospel were to offer the program it described in its petition; and that the Church received fees from the music and piano students and paid Ms. Kim's salary.

Nevertheless, the AAU concluded that the Church had failed to demonstrate that Ms. Kim "would be employed in preponderant part in a capacity requiring the skills of a professional as either a musical accompanist or a teacher," and had failed to "establish [the Church] had the ability to pay [Ms. Kim's] salary as of December 1984." It upheld the District Director's determination that the position did not qualify as a profession pursuant to case law. Thereafter, defendants denied Ms. Kim's application for an adjustment of status to become a permanent resident and revoked permission for her to work.

### D. *Subsequent Events.*

On September 30, 1987, Full Gospel submitted to defendants a Motion to Reopen and Reconsider the Third Preference petition, and a petition for a Sixth Preference Visa, which are granted to skilled workers coming to perform skilled services. The standard for skilled workers under the Sixth Preference is not as strict as that for professional workers under a Third Preference visa:

> Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a) of

this title, to qualified immigrants who are capable of performing *specified skilled or unskilled labor,* not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States. (Emphasis added.)

8 U.S.C. § 1153(a)(6). Defendants denied the Sixth Preference petition at Ms. Kim's deportation hearing last February, and plaintiffs appealed. Defendants still have not acted on either the Third Preference Motion to Reopen, filed in September, 1987, or the Sixth Preference appeal.

This Court must first determine whether it has jurisdiction, prior to administrative action on her Motion to Reopen and her Sixth Preference appeal, to consider these issues. If the Court does have jurisdiction, and finds she has exhausted her administrative remedies or otherwise is properly before the Court, the Court must address the second question of whether the District Director and the Administrative Appeals Unit correctly revoked her Third Preference visa and denied her Sixth Preference Visa, or whether the revocation was an abuse of discretion. Finally, plaintiffs ask the Court to declare Ms. Kim eligible for an adjustment of status.

## II. *Jurisdiction.*

Title 8 U.S.C. § 1329 and the Administrative Procedure Act, 5 U.S.C. §§ 701–706, grant this Court jurisdiction to consider whether or not plaintiff has exhausted her administrative remedies.

## III. *Exhaustion of Administrative Remedies.*

The basis of the government's motion to dismiss is that Ms. Kim has not exhausted her administrative remedies and thus, the matter is not ripe.

While the Court recognizes that the INS is overburdened, it has been over a year since the Third Preference motion was filed, and seven months since the Sixth Preference appeal was filed. This delay justifies the District Court in compelling agency action. Section 706 of the Administrative Procedure Act provides that:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld *or unreasonably delayed;* and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.... (Emphasis added.)

The INS has unreasonably delayed a determination on the reopening. The September 30, 1987 Motion to Reopen the denial of the Third Preference visa and the February 29, 1988 appeal of the Sixth Preference denial are thus ripe for adjudication.

Under the circumstances of this case, agency delay is equivalent to the denial of relief, thereby justifying judicial review before all administrative avenues are fully exhausted. *Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093, 1099 (D.C.Cir.1970). The Court is well aware that many petitioners to the INS seek and benefit from delay. However, with the strict prohibitions on Ms. Kim's ability to work, and her apparent compliance, the INS may be essentially starving the petitioner out of the country. More importantly, postponing review that would be favorable to the plaintiff may result in the immediate, direct and significant hardship of deportation. *State Farm Mutual Auto Insurance Co. v. Dole,* 802 F.2d 474 (D.C.Cir. 1986), *cert. den., New York v. Dole,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). Ms. Kim must have her visa status approved before the final resolution of the deportation order, since it will affect her possible deportation.

Moreover, the waiver of exhaustion is justified because Ms. Kim has no realistic chance of prevailing before the agency, regardless of the record she presented. In a letter to Ms. Kim's Oregon counsel dated

November 10, 1987, the District Director stated that:

> "[T]here is little likelihood that your clients will derive resident status in the immediate future; there are no visa numbers available to them under the sixth preference category at the present time; there is little likelihood that the Motion to Reopen and Reconsider the revocation of the third preference petition will be granted ..."

Waiting for a decision on the motions would thus be futile, according to the statements of the INS itself. The Administrative Appeals Unit appeared not to make an independent determination of Ms. Kim's professional status on her Third Preference appeal; rather, it rubber-stamped the District Director's revocation, adding only another, equally-unavailing reason for revocation. The futility of waiting out the administrative process further justifies intervention now. *Rafeedie v. INS*, 688 F.Supp. 729 (D.D.C.1988); *Atlantic Richfield Co. v. United States Department of Energy*, 769 F.2d 771, 781–782 (D.C.Cir.1985).

 The exhaustion rule serves: (1) to promote administrative efficiency by preventing premature interference with agency processes; (2) to encourage respect for executive autonomy by allowing the agency the opportunity to correct its own errors; (3) to facilitate judicial review by affording courts the benefits of the agency's expertise; (4) to promote judicial economy by having the agency compile the factual record. *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975). Due to the delay mentioned above, Ms. Kim's resort to the District Court does not prematurely interrupt any agency proceedings. *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Athlone Industries, Inc. v. Consumer Product Safety Commission*, 707 F.2d 1485 (D.C.Cir.1983). The agency has had a chance to rectify error, and has failed to do so. Ms. Kim is at risk of being deported, and if error is present the agency's concern for the proper sequence of determinations in this case must be ignored. The benefits of the INS's expertise in this case have been minimal, and

the agency had a sufficient factual record upon which to base its review at the appeal of the revocation and when it denied the Sixth Preference petition. *McKart*, 395 U.S. at 194–195, 89 S.Ct. at 1662–63; *Athlone*, 707 F.2d at 1488. Issues relating to the Third and Sixth Preference Visa petitions are properly before the Court.

## IV. *Burden of Proof for Revocations and Visa Denials.*

 The Court will next turn to the substantive reasons for which Ms. Kim's visa petition was revoked. In this inquiry, Ms. Kim ultimately bears the burden of proof as to her eligibility for a visa, 8 U.S.C. § 1361. However, the Attorney General is entitled to revoke a visa petition only if he or she has "good and sufficient cause" to do so. 8 U.S.C. § 1155. The INS must sustain a much heavier burden of proof when it seeks to invalidate a visa petition that has already been granted than when it initially denies a visa, as petitioners have a much more significant interest in continuing in a status according them work privileges than in initially obtaining such a status. The Service retains at least the burden of producing substantial evidence supporting its determination when it seeks to revoke a visa petition. *Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*, 736 F.2d 1305, 1308–1310 (9th Cir.1984). Revocations have been sustained when a petitioner's statements were inconsistent and a supporting affidavit was found to be fraudulent. *Joseph v. Landon*, 679 F.2d 113 (7th Cir.1982); or when investigation found substantial overestimation in the estimates of employer's gross annual income contained in the labor certification application. *Tongatapu*, 736 F.2d at 1310. There are no similar allegations of fraud, misrepresentations or newly discovered facts here.

## V. *Visa Revocation and Denial.*

### A. *Ms. Kim's Professional Status.*

 The thrust of the District Director's rationale for revoking Ms. Kim's visa petition is that she is not a professional, and

that Full Gospel did not need a professional music teacher.

Ms. Kim is a credentialed music composition graduate of a respected Korean institution, Song Sim University (Sacred Heart), and her credential was judged to be the equivalent of a Bachelor of Arts degree in Music, Theory and Composition. While most of her course work was in music itself, rather than education, she did study educational psychology, development of youth, curriculum and method of teaching, guidance, and took courses in the history and principles of education. She has particular skills obtained through a specialized training program and higher education. She directed the Church's music program. As choir director, she not only accompanied the choir's singing, but she directed it, arranged the pieces, and supervised its three hours of practice each week. She was required to play at services seven days a week, twice a day most days, usually beginning at 6:00 a.m. As Full Gospel's piano teacher, she taught the very subjects she studied in college: music, theory, harmony, score, sight reading, composition and music appreciation, at the beginner, intermediate and advanced stages. Although she did not supervise other employees, she instructed students for 28 hours per week, which, of course, required significant time outside of work to plan. She was required to fulfill extra duties, such as to play on holidays or for special occasions, and the affidavits make no mention of pay over and above her $900 per month salary. She also needed to devote herself to independent practice.[2] As numerous affidavits attested, she worked in a prestigious and essential position in the Church and in the Korean community in Portland.

The word "professional" has lost much of its meaning and does not admit of precise definition. However, as quoted above, the Act defines teachers as professionals, and does not limit professional teachers to those teaching at accredited schools. Immigration cases define a professional position as

> one which requires a standard and at least baccalaureate level of university education for practice, in which that education is used and applied, and which requires extensive autonomous application of individual professional knowledge to particular fact situations. *Re Portugues Do Atlantico Information Bureau, Inc.*, I & N Interim Dec. No. 2982 (Comnr., 1984).

No section of the Code of Federal Regulations further elucidates what characteristics distinguish professional positions from non-professional ones pursuant to § 203 of the INA, but the Code offers a much more satisfactory framework for evaluating professional status under the Fair Labor Standards Act, 29 U.S.C. § 213, which exempts professionals from minimum wage and maximum hour laws. 29 C.F.R. § 541 (1987). Ms. Kim's job seems to be an amalgam of the three types of professional work specified therein: those jobs requiring knowledge acquired by specialized study; work that is original and creative in character; and teaching, and she clearly fits within both the artistic and the teaching exemptions. Section 541.3 of 29 C.F.R. (1987) defines "Professional" as follows:

> The term "employee employed in a bona fide ... professional capacity" ... shall mean any employee:

> (a) Whose primary duty consists of the performance of:

> (1) Work requiring knowledge of an advance (sic) type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or

> (2) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which

---

2. Typically, cases refer to the *Dictionary of Occupational Titles* published by the Department of Labor to ascertain whether a job is professional. *See, e.g., Matter of Asuncion*, 11 I & N 660 (Regional Comnr.1966). Its definition of Music Teacher describes responsibilities Ms. Kim performs.

can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee, or

(3) Teaching, tutoring, instructing in the activity of imparting knowledge and who is employed and engaged in this activity as a teacher in the school system or educational establishment or institution by which he is employed.

Under the accompanying explanations, the learned degree category is usually typified by "the appropriate academic degree," § 541.302(e)(1), in Ms. Kim's case, a B.A. in Music. As a pianist and choir conductor, Ms. Kim is a professional artist. "Musicians, composers, conductors, [and] soloists, are all engaged in original and creative work within the sense of [§ 541.-3(a)(2)]." § 541.303(c)(1). With regard to the requirement of the artistic exemption that the result must depend primarily upon the invention, imagination or talent of the employee, the regulations off-handedly state that: "This requirement is easily met by a person employed as an actor, or a singer, or a violinist, or a short-story writer." § 541.303(d). If a violinist is a professional artist, a pianist qualifies.

Teaching also explicitly includes "vocal or instrumental music instructors," § 541.302(g)(2), and a certificate is only required if the teacher is teaching in a public school or in a private school requiring certification, or like situations. § 541.302.(g)(3).

The other requirements of professional status under the labor statutes are also met by Ms. Kim's job. Her teaching and choir directing "require[s] the consistent exercise of discretion and judgment in its performance" in conformance with § 541.3(b). Her work is also "predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the result accomplished cannot be standardized in relation to a given period of time," as § 541.3(c) requires. That is, for example, her students may progress at a rate that cannot be standardized, and one cannot conduct a choir practice in any routine fashion. The regulations recognize in § 541.3(d) that not every moment of a professional's time is devoted to activities that fit the requirements of professionalism, as described above. So even if up to twenty percent of Ms. Kim's time is devoted to more routine, non-creative work, she may still maintain her professional status.

The final requirement of professionalism concerns salary. To be a professional, one must be compensated at a rate of not less than $170 per week. § 541.3(e). Although the District Director stated that her salary was not in the range considered professional, her salary is within this legal benchmark. Ms. Kim will make $10,800 per year; the minimum professional salary is $8,840. Her salary may be below that of many other professionals for reasons unrelated to her professional status. Churches are likely to have less ability to pay high salaries than for-profit enterprises, though affidavits from ministers of other churches attest to the crucial need to have a professional music director, especially in evangelical churches. The arts generally pay smaller salaries than technical fields, and, as has been much noted, women working in jobs not dominated by men generally seem to be at the short end of a pay-gap.

The Court finds that Ms. Kim's responsibilities were professional. She is involved in Korean music. It is highly unlikely that similar programs could be run by an American without baccalaureate and professional qualifications. The Court is convinced that a baccalaureate program would ordinarily be required.[3]

---

**3.** Cases cited by the parties are not to the contrary. For example, in *Matter of Delis,* the petitioner had no baccalaureate degree, having only received a diploma as a language teacher awarded by a teacher's college after three years of general college study. 11 I & N 860 (Regional Comnr.1966). *Matter of Shin,* 11 I & N 686 (Dist.Dir.1966) quotes *Webster's New International Dictionary* definition of professional, "The occupation, if not purely commercial, mechanical, agricultural or the like, to which one devotes oneself: a calling in which one professes to have acquired some special knowledge used by way *either of instructing, guiding, or*

Full Gospel presented affidavits testifying to the central role music plays in Korean culture generally and to Korean Christian churches in particular. These affidavits are in accord with Korean texts not prepared with an eye towards litigation. In his authoritative history of Korea, *A New History of Korea*, Professor Lee Ki-baik weaves the theme of the importance of music to Korean culture in general and Korean religion in particular. In every major period and movement in Korea's long history, music and religion have inspired and sustained each other. Music was central to shamanistic worship, ancestor worship and heaven worship from the Neolithic age to shamanism's present vestiges; it has been integral to the religious harvest festivals since the Confederated Kingdoms period from about the beginning of the First Century A.D. Music has been linked with Buddhism since its arrival in Korea in 372. The intellectual, religious and philosophical life of the Korean aristocrat has been marked by poetry and music since the Three Kingdoms period and particularly after the introduction of Confucianism, which was the philosophy of the aristocratic classes from about 700. Even the soul of modern nationalist political movements in the nineteenth and twentieth centuries have been expressed musically. So it is no surprise that Christianity in Korea, since its introduction in 1653, and especially after the arrival of missionaries in the 1880's, has propagated its message through music.[4] Given these historical links of music and religion, with the emphasis Koreans and Korean–American culture place on education, it is entirely understandable that a college degree is necessary to teach in a church whose music program caters to Korean–Americans, when such a degree might be unnecessary in another setting.

The INS' objections to Ms. Kim's professional status are not supported by substantial evidence. If Ms. Kim had been teaching at an unaccredited match-book correspondence school, the objection to Full Gospel's unaccredited status might have more merit. However, this objection holds little weight regarding a church music program. Such programs typically hire music professionals, even though they do not ordinarily acquire any sort of accreditation.

Second, even if, as the District Director contends, the program did not have many advanced students soon after its inception, it is understandable that the Church would want someone of Ms. Kim's training, so as to be able to teach those children who progressed to the intermediate and advanced stages, and to teach more advanced students when they signed up for classes. Moreover, the fact that she studied music itself, rather than focusing primarily on education does not impair her professional status as a musician or music teacher.

Finally, in upholding the revocation of her visa, the AAU commented critically that Ms. Kim's career was interrupted, and that this was further evidence that she is not a professional. However, the Church submitted over twenty affidavits attesting to her experience as a music teacher over a twenty-one month period from May, 1975 to March, 1977 in Korea. At no little inconvenience, these affidavits were gathered from her students who continue to live in Korea. The INS' objection to any interruptions in a career is inappropriate, as professional careers are often interrupted by childbirth or childrearing, moves (or emigration), family illnesses, travel or other circumstances. To link an uninterrupted career with professionalism might well have a disparate impact on the professional status of women, though many men, of course, also interrupt their careers for one reason or another. A professional music teacher should not be stripped of her status by virtue of an interruption in her career as she struggles to enter American society.

The Court accordingly finds the revocation of Ms. Kim's Third Preference visa petition to be clearly erroneous.

---

*advising others or of serving them in some art ...*", (emphasis added), and *Shin* finds financial economics to be a "highly specialized knowledge of an advance[d] type" meriting professional status.

**4.** Lee, Kai-baik, *A New History of Korea*, translated by Edward W. Wagner with Edward J. Shultz, Ilchokak Publishers, Seoul, Korea, at 8, 34–35, 61–62, 86–88, 197–199, 337–338 (1984).

In addition, the decision of February 25, 1988 denying her Sixth Preference (skilled worker) visa petition was unjustified and an abuse of discretion. In order to obtain a Sixth Preference visa when numbers are available, the petitioner need only show that it has a job for the petitioner, the ability to pay her, and that the beneficiary meets the qualifications required by the job offer. Full Gospel petitioned defendants for a Sixth Preference visa on September 30, 1987. Sixth preference visa numbers were not available then, but numbers became available on February 1, 1988. However, defendants lost her original application: when plaintiff's counsel called on February 18, 1988 to inquire about the status of the petition, she was told there was no such petition in the file. Plaintiff's counsel immediately recopied all the information and sent it to defendants. Ms. Kim was denied the visa at her deportation hearing February 29, 1988 by a written decision dated February 25. The immigration judge found her deportable, there being no approved visa petition.

Surely, even if the INS might have doubted her professional status, it was clearly unreasonable and an abuse of discretion to deny her a skilled preference visa when numbers were available. In addition to her musical and pedagogical skills, the INS apparently did not consider her facility in the Korean language, an essential pre-requisite for her job at Full Gospel. As will be discussed below, denial on the basis of Full Gospel's alleged inability to pay would also have been an abuse of discretion. Because visa numbers were available during the pendency of her application, and because denial seems to have been based on the same considerations that led to denial of her Sixth Preference visa, denial was an abuse of discretion.

B. *The Church's Ability to Pay for Ms. Kim's Position.*

The District Director contended that Full Gospel's job offer was not bona fide, and the AAU stated further that there was "no evidence … that the petitioner was immediately able to pay the beneficiary's proffered salary when it filed its application for alien labor certification." Yet there is ample evidence that Full Gospel could pay, and a continued denial of her visa is thus clear error. The Church submitted its 1984, 1985 and 1986 financial statements, which showed that it had revenue and working capital in the years 1984, 1985 and 1986 sufficient to support her $900 per month salary. In addition, it had received pledges totalling $41,600 to be paid over a four-year period by its own parishioners solely for use by the music school. Full Gospel has also submitted 33 affidavits by residents in the Portland metropolitan area who attested to the need for a music program at Full Gospel. Even if some of the students quit their music lessons, as the District Director surmised, Full Gospel will likely be able to support Ms. Kim as new students sign up. The fact of turnover is not prohibitive. Overall, the trend is likely to be in the other direction, as the Full Gospel Church and the Korean community in Portland are growing. Because the petitioner has shown a reasonable expectation of increased business, the visa should be approved. *Matter of Sonegawa,* 12 I & N 612 (Regional Comnr.1967).

Moreover, the Church need not be fully self-reliant. It has submitted statements of its national organization, Assemblies of God Korean District Council of the United States, which provides educational, missionary, financial and counseling support to the Full Gospel Church. The affidavit of Rev. Richard Chung, Secretary–Treasurer of the Council of the United States, promises that if the need arose for financial support for Full Gospel's music program, the Council would provide such support. These promises further support the plaintiffs' contention that the Church could pay her salary, and assure the Court that the decision at the Administrative Appeals Unit was in clear error. Both the District Director and the AAU contend, without support, that the Full Gospel Portland Church is the sole relevant financial supporter for the purpose of determining the employer's ability to pay Ms. Kim. Clearly, if Full Gospel is financially linked to the larger church in the United States, and it has obtained

pledges of support for the music program from the nationwide church, the INS must consider these resources. New divisions in businesses or new parishes of larger churches may not themselves be financially profitable, but if documents show that they may rely on the larger body for support, it is arbitrary and capricious for the INS not to consider the resources of the larger organization in making its evaluation of ability to pay.

VI. *Requests for Adjustment of Status and to Stay Deportation Proceedings.*

■ Plaintiff also requests that this Court declare her eligible for an adjustment of status to become a permanent resident and enjoin the Immigration and Naturalization Service from continuing in the deportation proceedings. The Court cannot simply declare Ms. Kim eligible to become a permanent resident, because more is involved than simply having a valid visa petition. Title 8 U.S.C. § 1255, § 1255a and § 1255b (1986) enumerate the various elements involved in adjusting one's status to that of a permanent resident. The Court does not have before it any evidence regarding factors other than her visa petition, so it is unable to make a determination on adjustment of status based on the papers before it.

Ms. Kim's complaint requested that the Court stay deportation proceedings, which it cannot do, either. Plaintiff has failed to exhaust her administrative remedies and the Court lacks jurisdiction. Plaintiff currently has an appeal from the order of deportation pending, and Section 106 of the Immigration and Naturalization Act, 8 U.S.C. § 1105a, gives exclusive review of final deportation orders to the Circuit Courts. However, any deportation proceeding or appeal from the denial of Ms. Kim's petition to adjust her status must take into account the conclusions of this Memorandum opinion.

A separate Order in accord with this Memorandum is attached.

### ORDER

This matter is before the Court on defendants' motion to dismiss (treated as a motion for summary judgment) and plaintiffs' cross-motion for summary judgment. For the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that the defendants' motion is denied; and it is further

ORDERED that plaintiffs' motion for summary judgment is granted with reference to petitioner's Third and Sixth preference visa petitions, as of the dates she first applied for them; and it is further

ORDERED that plaintiffs' motion for summary judgment on adjustment of Ms. Kim's status is denied, without prejudice, except that the Immigration and Naturalization Service is directed to consider and to abide by the determinations in this Order as to Ms. Kim's visa petitions in any matter relating to adjustment of Ms. Kim's status.

### On Application For Attorney Fees

This is an application for attorney fees, expenses and costs under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412. It involves plaintiffs' successful effort in this Court to overturn a proposed deportation of plaintiff Hae Sook Kim following administrative proceedings before the Immigration and Naturalization Service of the United States Department of Justice ("INS"). The underlying facts are fully set out in the Court's Memorandum and Order of October 17, 1988 and need not be repeated here. The application is opposed. Efforts to resolve the fee dispute pursuant to Rule 215 of the Rules of this Court were unsuccessful.

■ After considering the pertinent papers, the Court finds and concludes as follows.

(1) Plaintiffs are the prevailing party on all significant issues. No appeal was perfected.

(2) The government's decision to deport, which followed from a series of administrative actions and nonactions, was not within the bounds of reasonableness and not "substantially justified." *Battles Farm Co. v. Pierce*, 806 F.2d 1098, 1101–2, n. 11 (D.C. Cir.1986); 28 U.S.C. § 2412(d)(1)(A) (Supp. III 1985). The record establishes that the decision to deport was made without consideration of factual information clearly es-

tablishing Hae Sook Kim's eligibility to remain in this country and inexcusable bureaucratic inattention. INS pursued its course before the Court, ignoring plain facts in an effort to develop new justifications for its course of action.

The INS Director's denial of the Third Preference visa petition was made without his making an independent evaluation of the facts and this conduct led to a wholly unjustified denial of the Sixth Preference petition. That INS, in addition, lost the Sixth Preference papers and only acted on the very eve of the deportation hearing, simply compounded its clearly unjustifiable conduct.

(3) The defendants contend that no administrative time may be awarded under EAJA. There can be no question but that proceedings before the INS in this instance were adversary as they involved a plaintiff's right to continue to reside and work in the United States. EAJA contemplates award for all reasonable administrative work of an adversary character after the agency has taken a position that is not "substantially justified" affecting the basic issue at stake. *Hudson v. Secretary of Health and Human Services*, 839 F.2d 1453, 1459–60 (11th Cir.1988). All administrative time claimed by Washington counsel falls in this category.

(4) Washington counsel, of course, also claims time logged during this litigation, including the deportation hearings, and subsequent work relating to the government's initial decision to appeal, as well as preparation of the fee application.

(5) All time is thoroughly documented, was clearly efficiently expended and necessary and thus entitled to consideration. Washington counsel is experienced and competent in this special area of INS expertise. The parties have advised the Court in a report that Washington counsel is entitled to an hourly rate of $97.20. This is wholly consistent with counsel's training and experience and the level of fee in the community.

The Court awards 258.3 hours at this rate, which includes time spent dealing with the government's initial notice of its decision to appeal. (See Plaintiffs' Reply Brief, page 6.)

| Litigation: | Hours |
|---|---|
| (a) Complaint filed with U.S. District Court | 44.0 |
| (b) Motion for attorney fees and costs | 59.3 |
| (c) Time spent after government appeal | 36.0 |
| | 139.3 |
| Administrative proceedings: | |
| (a) Before litigation | 93.0 |
| (b) After litigation | 13.0 |
| (c) Deportation defense | 13.0 |
| | 119.0 |
| Total: | 258.3 |

(6) No fee can be awarded Oregon counsel, whose role in the case is not clearly defined and whose time records cannot be interpreted to clarify the nature of the legal work performed or the amount of time reasonably required.

(7) The following costs and expenses are allowed for Washington counsel:

| (a) Filing Fees: | |
|---|---|
| U.S. District Court | $120.00 |
| INS | 210.00 |
| (Motion to reopen–$50.00; Appeal Sixth Preference Visa Petition–$50.00; Appeal deportation order–$110.00) | |
| (b) Airline fare to attend deportation hearing | 437.99 |
| Total costs and expenses allowed: | $767.99 |